# CITY OF ST. LOUIS *v.* PRAPROTNIK

No. 86–772.   Argued October 7, 1987—Decided March 2, 1988

O'CONNOR, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and WHITE and SCALIA, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 132. STEVENS, J., filed a dis-

senting opinion, *post*, p. 147. KENNEDY, J., took no part in the consideration or decision of the case.

*James J. Wilson* argued the cause for petitioner. With him on the briefs was *Julian L. Bush.*

*Charles R. Oldham* argued the cause for respondent. With him on the brief were *Julius LeVonne Chambers* and *Eric Schnapper.**

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SCALIA join.

This case calls upon us to define the proper legal standard for determining when isolated decisions by municipal officials or employees may expose the municipality itself to liability under 42 U. S. C. § 1983.

I

The principal facts are not in dispute. Respondent James H. Praprotnik is an architect who began working for petitioner city of St. Louis in 1968. For several years, respondent consistently received favorable evaluations of his job performance, uncommonly quick promotions, and significant increases in salary. By 1980, he was serving in a management-level city planning position at petitioner's Community Development Agency (CDA).

The Director of CDA, Donald Spaid, had instituted a requirement that the agency's professional employees, including architects, obtain advance approval before taking on private clients. Respondent and other CDA employees ob-

---

*\*Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch,* and *Carter G. Phillips* filed a brief for the International City Management Association et al. as *amici curiae* urging reversal.

*Michael H. Gottesman, David M. Silberman,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al. as *amici curiae* urging affirmance.

*Mark Stodola* and *Thomas M. Carpenter* filed a brief for the city of Little Rock et al. as *amicus curiae.*

jected to the requirement. In April 1980, respondent was suspended for 15 days by CDA's Director of Urban Design, Charles Kindleberger, for having accepted outside employment without prior approval. Respondent appealed to the city's Civil Service Commission, a body charged with reviewing employee grievances. Finding the penalty too harsh, the Commission reversed the suspension, awarded respondent backpay, and directed that he be reprimanded for having failed to secure a clear understanding of the rule.

The Commission's decision was not well received by respondent's supervisors at CDA. Kindleberger later testified that he believed respondent had lied to the Commission, and that Spaid was angry with respondent.

Respondent's next two annual job performance evaluations were markedly less favorable than those in previous years. In discussing one of these evaluations with respondent, Kindleberger apparently mentioned his displeasure with respondent's 1980 appeal to the Civil Service Commission. Respondent appealed both evaluations to the Department of Personnel. In each case, the Department ordered partial relief and was upheld by the city's Director of Personnel or the Civil Service Commission.

In April 1981, a new Mayor came into office, and Donald Spaid was replaced as Director of CDA by Frank Hamsher. As a result of budget cuts, a number of layoffs and transfers significantly reduced the size of CDA and of the planning section in which respondent worked. Respondent, however, was retained.

In the spring of 1982, a second round of layoffs and transfers occurred at CDA. At that time, the city's Heritage and Urban Design Commission (Heritage) was seeking approval to hire someone who was qualified in architecture and urban planning. Hamsher arranged with the Director of Heritage, Henry Jackson, for certain functions to be transferred from CDA to Heritage. This arrangement, which made it possible for Heritage to employ a relatively high-level "city planning

manager," was approved by Jackson's supervisor, Thomas Nash. Hamsher then transferred respondent to Heritage to fill this position.

Respondent objected to the transfer, and appealed to the Civil Service Commission. The Commission declined to hear the appeal because respondent had not suffered a reduction in his pay or grade. Respondent then filed suit in Federal District Court, alleging that the transfer was unconstitutional. The city was named as a defendant, along with Kindleberger, Hamsher, Jackson (whom respondent deleted from the list before trial), and Deborah Patterson, who had succeeded Hamsher at CDA.

At Heritage, respondent became embroiled in a series of disputes with Jackson and Jackson's successor, Robert Killen. Respondent was dissatisfied with the work he was assigned, which consisted of unchallenging clerical functions far below the level of responsibilities that he had previously enjoyed. At least one adverse personnel decision was taken against respondent, and he obtained partial relief after appealing that decision.

In December 1983, respondent was laid off from Heritage. The layoff was attributed to a lack of funds, and this apparently meant that respondent's supervisors had concluded that they could create two lower level positions with the funds that were being used to pay respondent's salary. Respondent then amended the complaint in his lawsuit to include a challenge to the layoff. He also appealed to the Civil Service Commission, but proceedings in that forum were postponed because of the pending lawsuit and have never been completed. Tr. Oral Arg. 31–32.

The case went to trial on two theories: (1) that respondent's First Amendment rights had been violated through retaliatory actions taken in response to his appeal of his 1980 suspension; and (2) that respondent's layoff from Heritage was carried out for pretextual reasons in violation of due process. The jury returned special verdicts exonerating

each of the three individual defendants, but finding the city liable under both theories. Judgment was entered on the verdicts, and the city appealed.

A panel of the Court of Appeals for the Eighth Circuit found that the due process claim had been submitted to the jury on an erroneous legal theory and vacated that portion of the judgment. With one judge dissenting, however, the panel affirmed the verdict holding the city liable for violating respondent's First Amendment rights. 798 F. 2d 1168 (1986). Only the second of these holdings is challenged here.

The Court of Appeals found that the jury had implicitly determined that respondent's layoff from Heritage was brought about by an unconstitutional city policy. *Id.*, at 1173. Applying a test under which a "policymaker" is one whose employment decisions are "final" in the sense that they are not subjected to *de novo* review by higher ranking officials, the Court of Appeals concluded that the city could be held liable for adverse personnel decisions taken by respondent's supervisors. *Id.*, at 1173–1175. In response to petitioner's contention that the city's personnel policies are actually set by the Civil Service Commission, the Court of Appeals concluded that the scope of review before that body was too "highly circumscribed" to allow it fairly to be said that the Commission, rather than the officials who initiated the actions leading to respondent's injury, were the "final authority" responsible for setting city policy. *Id.*, at 1175.

Turning to the question whether a rational jury could have concluded that respondent had been injured by an unconstitutional policy, the Court of Appeals found that respondent's transfer from CDA to Heritage had been "orchestrated" by Hamsher, that the transfer had amounted to a "constructive discharge," and that the injury had reached fruition when respondent was eventually laid off by Nash and Killen. *Id.*, at 1175–1176, and n. 8. The court held that the jury's verdict exonerating Hamsher and the other individual defendants could be reconciled with a finding of liability

against the city because "the named defendants were not the supervisors directly causing the lay off, when the actual damages arose." *Id.*, at 1173, n. 3. Cf. *Los Angeles* v. *Heller*, 475 U. S. 796 (1986).

The dissenting judge relied on our decision in *Pembaur* v. *Cincinnati*, 475 U. S. 469 (1986). He found that the power to set employment policy for petitioner city of St. Louis lay with the Mayor and Aldermen, who were authorized to enact ordinances, and with the Civil Service Commission, whose function was to hear appeals from city employees who believed that their rights under the city's Charter, or under applicable rules and ordinances, had not been properly respected. 798 F. 2d, at 1180. The dissent concluded that respondent had submitted no evidence proving that the Mayor and Aldermen, or the Commission, had established a policy of retaliating against employees for appealing from adverse personnel decisions. *Id.*, at 1179–1181. The dissenting judge also concluded that, even if there were such a policy, the record evidence would not support a finding that respondent was in fact transferred or laid off in retaliation for the 1980 appeal from his suspension. *Id.*, at 1181–1182.

We granted certiorari, 479 U. S. 1029 (1987), and we now reverse.

## II

We begin by addressing a threshold procedural issue. The second question presented in the petition for certiorari reads as follows:

> "Whether the failure of a local government to establish an appellate procedure for the review of officials' decisions which does not defer in substantial part to the original decisionmaker's decision constitutes a delegation of authority to establish final government policy such that liability may be imposed on the local government on the basis of the decisionmaker's act alone, when the act is neither taken pursuant to a rule of general applicability

nor is a decision of specific application adopted as the result of a formal process?"  Pet. for Cert. *i.*

Although this question was manifestly framed in light of the holding of the Court of Appeals, respondent argues that petitioner failed to preserve the question through a timely objection to the jury instructions under Federal Rule of Civil Procedure 51.  Arguing that both parties treated the identification of municipal "policymakers" as a question of fact at trial, respondent emphasizes that the jury was given the following instruction, which was offered by the city itself:

> "As a general principle, a municipality is not liable under 42 U. S. C. 1983 for the actions of its employees. However, a municipality may be held liable under 42 U. S. C. 1983 if the allegedly unconstitutional act was committed by an official high enough in the government so that his or her actions can be said to represent a government decision."  App. 113.

Relying on *Oklahoma City* v. *Tuttle*, 471 U. S. 808 (1985), and *Springfield* v. *Kibbe*, 480 U. S. 257 (1987), respondent contends that the jury instructions should be reviewed only for plain error, and that the jury's verdict should be tested only for sufficiency of the evidence.  Declining to defend the legal standard adopted by the Court of Appeals, respondent vigorously insists that the judgment should be affirmed on the basis of the jury's verdict and petitioner's alleged failure to comply with Rule 51.

Petitioner argues that it preserved the legal issues presented by its petition for certiorari in at least two ways. First, it filed a pretrial motion for summary judgment, or alternatively for judgment on the pleadings.  In support of that motion, petitioner argued that respondent had failed to allege the existence of any impermissible municipal policy or of any facts that would indicate that such a policy existed. Second, petitioner filed a motion for directed verdict at the close of respondent's case, renewed that motion at the close

of all the evidence, and eventually filed a motion for judgment notwithstanding the verdict.

Respondent's arguments do not bring our jurisdiction into question, and we must not lose sight of the fact, stressed in *Tuttle,* that the "decision to grant certiorari represents a commitment of scarce judicial resources with a view to deciding the merits of one or more of the questions presented in the petition." 471 U. S., at 816. In *Kibbe,* it is true, the writ was dismissed in part because the petitioner sought to challenge a jury instruction to which it had not objected at trial. In the case before us, the focus of petitioner's challenge is not on the jury instruction itself, but on the denial of its motions for summary judgment and a directed verdict. Although the same legal issue was raised both by those motions and by the jury instruction, "the failure to object to an instruction does not render the instruction the 'law of the case' for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict." *Kibbe, supra,* at 264 (dissenting opinion) (citations omitted). Petitioner's legal position in the District Court—that respondent had failed to establish an unconstitutional municipal policy—was consistent with the legal standard that it now advocates. It should not be surprising if petitioner's arguments in the District Court were much less detailed than the arguments it now makes in response to the decision of the Court of Appeals. That, however, does not imply that petitioner failed to preserve the issue raised in its petition for certiorari. Cf. *post,* at 165–167 (STEVENS, J., dissenting). Accordingly, we find no obstacle to reviewing the question presented in the petition for certiorari, a question that was very clearly considered, and decided, by the Court of Appeals.

We note, too, that petitioner has throughout this litigation been confronted with a legal landscape whose contours are "in a state of evolving definition and uncertainty." *Newport* v. *Fact Concerts, Inc.,* 453 U. S. 247, 256 (1981). We therefore do not believe that our review of the decision of the

Court of Appeals, a decision raising a question that "is important and appears likely to recur in § 1983 litigation against municipalities," *id.*, at 257, will undermine the policy of judicial efficiency that underlies Rule 51. The definition of municipal liability manifestly needs clarification, at least in part to give lower courts and litigants a fairer chance to craft jury instructions that will not require scrutiny on appellate review.

## III

### A

Section 1 of the Ku Klux Act of 1871, Rev. Stat. § 1979, as amended, 42 U. S. C. § 1983, provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

Ten years ago, this Court held that municipalities and other bodies of local government are "persons" within the meaning of this statute. Such a body may therefore be sued directly if it is alleged to have caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 690 (1978). The Court pointed out that § 1983 also authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.*, at 690–691. At the same time, the Court rejected the use of the doctrine of *respondeat superior* and concluded that municipalities could be held liable only when an injury was inflicted by a govern-

ment's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.*, at 694.

*Monell's* rejection of *respondeat superior*, and its insistence that local governments could be held liable only for the results of unconstitutional governmental "policies," arose from the language and history of § 1983. For our purposes here, the crucial terms of the statute are those that provide for liability when a government "subjects [a person], or causes [that person] to be subjected," to a deprivation of constitutional rights. Aware that governmental bodies can act only through natural persons, the Court concluded that these governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights. Reading the statute's language in the light of its legislative history, the Court found that vicarious liability would be incompatible with the causation requirement set out on the face of § 1983. See *id.*, at 691. That conclusion, like decisions that have widened the scope of § 1983 by recognizing constitutional rights that were unheard of in 1871, has been repeatedly reaffirmed. See, *e. g.*, *Owen* v. *City of Independence*, 445 U. S. 622, 633, 655, n. 39 (1980); *Polk County* v. *Dodson*, 454 U. S. 312, 325 (1981); *Tuttle*, 471 U. S., at 818, and n. 5 (plurality opinion); *id.*, at 828 (BRENNAN, J., concurring in part and concurring in judgment); *Pembaur* v. *Cincinnati*, 475 U. S., at 478–480, and nn. 7–8. Cf. *Newport* v. *Fact Concerts, Inc.*, *supra*, at 259 ("[B]ecause the 1871 Act was designed to expose state and local officials to a new form of liability, it would defeat the promise of the statute to recognize any pre-existing immunity without determining both the policies that it serves and its compatibility with the purposes of § 1983").

In *Monell* itself, it was undisputed that there had been an official policy requiring city employees to take actions that were unconstitutional under this Court's decisions. Without attempting to draw the line between actions taken pursuant to official policy and the independent actions of employees

and agents, the *Monell* Court left the "full contours" of municipal liability under § 1983 to be developed further on "another day." 436 U. S., at 695.

In the years since *Monell* was decided, the Court has considered several cases involving isolated acts by government officials and employees. We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business. See, *e. g., Owen* v. *City of Independence, supra; Newport* v. *Fact Concerts, Inc.,* 453 U. S. 247 (1981). Cf. *Pembaur, supra,* at 480. At the other end of the spectrum, we have held that an unjustified shooting by a police officer cannot, without more, be thought to result from official policy. *Tuttle,* 471 U. S., at 821 (plurality opinion); *id.,* at 830–831, and n. 5 (BRENNAN, J., concurring in part and concurring in judgment). Cf. *Kibbe,* 480 U. S., at 260 (dissenting opinion).

Two Terms ago, in *Pembaur, supra,* we undertook to define more precisely when a decision on a single occasion may be enough to establish an unconstitutional municipal policy. Although the Court was unable to settle on a general formulation, JUSTICE BRENNAN's opinion articulated several guiding principles. First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." *Id.,* at 480. Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *Id.,* at 483 (plurality opinion). Third, whether a particular official has "final policymaking authority" is a question of *state law. Ibid.* (plurality opinion). Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business. *Id.,* at 482–483, and n. 12 (plurality opinion).

The Courts of Appeals have already diverged in their interpretations of these principles. Compare, for example, *Williams* v. *Butler*, 802 F. 2d 296, 299–302 (CA8 1986) (en banc), cert. pending *sub nom. Little Rock* v. *Williams*, No. 86–1049, with *Jett* v. *Dallas Independent School Dist.*, 798 F. 2d 748, 759–760 (CA5 1986) (dictum). Today, we set out again to clarify the issue that we last addressed in *Pembaur*.

## B

We begin by reiterating that the identification of policymaking officials is a question of state law. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Pembaur* v. *Cincinnati, supra,* at 483 (plurality opinion).[1] Thus the identification of policymaking officials is not a question of federal law, and it is not a question of fact in the usual sense. The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. Among the many kinds of municipal corporations, political subdivisions, and special districts of all sorts, one may expect to find a rich variety of ways in which the power of govern-

---

[1] Unlike JUSTICE BRENNAN, we would not replace this standard with a new approach in which state law becomes merely an "appropriate starting point" for an "assessment of a municipality's actual power structure." *Post*, at 143, 145. Municipalities cannot be expected to predict how courts or juries will assess their "actual power structures," and this uncertainty could easily lead to results that would be hard in practice to distinguish from the results of a regime governed by the doctrine of *respondeat superior*. It is one thing to charge a municipality with responsibility for the decisions of officials invested by law, or by a "custom or usage" having the force of law, with policymaking authority. It would be something else, and something inevitably more capricious, to hold a municipality responsible for every decision that is perceived as "final" through the lens of a particular factfinder's evaluation of the city's "actual power structure."

ment is distributed among a host of different officials and official bodies. See generally C. Rhyne, The Law of Local Government Operations §§ 1.3–1.7 (1980). Without attempting to canvass the numberless factual scenarios that may come to light in litigation, we can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.[2]

We are not, of course, predicting that state law will always speak with perfect clarity. We have no reason to suppose,

---

[2] JUSTICE STEVENS, who believes that *Monell* incorrectly rejected the doctrine of *respondeat superior*, suggests a new theory that reflects his perceptions of the congressional purposes underlying § 1983. See *post*, at 148, n. 1. This theory would apparently ignore state law, and distinguish between "high" officials and "low" officials on the basis of an independent evaluation of the extent to which a particular official's actions have "the potential of controlling governmental decisionmaking," or are "perceived as the actions of the city itself." *Post*, at 171. Whether this evaluation would be conducted by judges or juries, we think the legal test is too imprecise to hold much promise of consistent adjudication or principled analysis. We can see no reason, except perhaps a desire to come as close as possible to *respondeat superior* without expressly adopting that doctrine, that could justify introducing such unpredictability into a body of law that is already so difficult.

As JUSTICE STEVENS acknowledges, see *post*, at 148, n. 1, this Court has repeatedly rejected his interpretation of Congress' intent. We have held that Congress intended to hold municipalities responsible under § 1983 only for the execution of official policies and customs, and not for injuries inflicted solely by employees or agents. See, *e. g., Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 694 (1978); *Pembaur* v. *Cincinnati*, 475 U. S. 469, 478–480 (1986). Like the *Pembaur* plurality, we think it is self-evident that official policies can only be adopted by those legally charged with doing so. See *supra*, at 124, and n. 1. We are aware of nothing in § 1983 or its legislative history, and JUSTICE STEVENS points to nothing, that would support the notion that unauthorized acts of subordinate employees *are* official policies because they may have the "potential" to become official policies or may be "perceived as" official policies. Accordingly, we conclude that JUSTICE STEVENS' proposal is without a basis in the law.

however, that federal courts will face greater difficulties here than those that they routinely address in other contexts. We are also aware that there will be cases in which policy-making responsibility is shared among more than one official or body. In the case before us, for example, it appears that the Mayor and Aldermen are authorized to adopt such ordinances relating to personnel administration as are compatible with the City Charter. See St. Louis City Charter, Art. XVIII, § 7(b), App. 62–63. The Civil Service Commission, for its part, is required to "prescribe . . . rules for the administration and enforcement of the provisions of this article, and of any ordinance adopted in pursuance thereof, and not inconsistent therewith." § 7(a), App. 62. Assuming that applicable law does not make the decisions of the Commission reviewable by the Mayor and Aldermen, or vice versa, one would have to conclude that policy decisions made either by the Mayor and Aldermen or by the Commission would be attributable to the city itself. In any event, however, a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it. And certainly there can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself.

As the plurality in *Pembaur* recognized, special difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official. 475 U. S., at 482–483, and n. 12. If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose. It may not be possible to draw an

elegant line that will resolve this conundrum, but certain principles should provide useful guidance.

First, whatever analysis is used to identify municipal policymakers, egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by a separate doctrine. Relying on the language of § 1983, the Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 167–168 (1970). That principle, which has not been affected by *Monell* or subsequent cases, ensures that most deliberate municipal evasions of the Constitution will be sharply limited.

Second, as the *Pembaur* plurality recognized, the authority to make municipal policy is necessarily the authority to make *final* policy. 475 U. S., at 481–484. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

## C

Whatever refinements of these principles may be suggested in the future, we have little difficulty concluding that the Court of Appeals applied an incorrect legal standard in this case. In reaching this conclusion, we do not decide whether the First Amendment forbade the city to retaliate against respondent for having taken advantage of the grievance mechanism in 1980. Nor do we decide whether there

was evidence in this record from which a rational jury could conclude either that such retaliation actually occurred or that respondent suffered any compensable injury from whatever retaliatory action may have been taken. Finally, we do not address petitioner's contention that the jury verdict exonerating the individual defendants cannot be reconciled with the verdict against the city. Even assuming that all these issues were properly resolved in respondent's favor, we would not be able to affirm the decision of the Court of Appeals.

The city cannot be held liable under § 1983 unless respondent proved the existence of an unconstitutional municipal policy. Respondent does not contend that anyone in city government ever promulgated, or even articulated, such a policy. Nor did he attempt to prove that such retaliation was ever directed against anyone other than himself. Respondent contends that the record can be read to establish that his supervisors were angered by his 1980 appeal to the Civil Service Commission; that new supervisors in a new administration chose, for reasons passed on through some informal means, to retaliate against respondent two years later by transferring him to another agency; and that this transfer was part of a scheme that led, another year and a half later, to his layoff. Even if one assumes that all this was true, it says nothing about the actions of those whom the law established as the makers of municipal policy in matters of personnel administration. The Mayor and Aldermen enacted no ordinance designed to retaliate against respondent or against similarly situated employees. On the contrary, the city established an independent Civil Service Commission and empowered it to review and correct improper personnel actions. Respondent does not deny that his repeated appeals from adverse personnel decisions repeatedly brought him at least partial relief, and the Civil Service Commission never so much as hinted that retaliatory transfers or layoffs were permissible. Respondent points to no evidence indicating that the Commission delegated to anyone its final authority to

interpret and enforce the following policy set out in Article XVIII of the city's Charter, § 2(a), App. 49:

"Merit and fitness. All appointments and promotions to positions in the service of the city and all measures for the control and regulation of employment in such positions, and separation therefrom, shall be on the sole basis of merit and fitness . . . ."

The Court of Appeals concluded that "appointing authorities," like Hamsher and Killen, who had the authority to initiate transfers and layoffs, were municipal "policymakers." The court based this conclusion on its findings (1) that the decisions of these employees were not individually reviewed for "substantive propriety" by higher supervisory officials; and (2) that the Civil Service Commission decided appeals from such decisions, if at all, in a circumscribed manner that gave substantial deference to the original decisionmaker. 798 F. 2d, at 1174–1175. We find these propositions insufficient to support the conclusion that Hamsher and Killen were authorized to establish employment policy for the city with respect to transfers and layoffs. To the contrary, the City Charter expressly states that the Civil Service Commission has the power and the duty:

"To consider and determine any matter involved in the administration and enforcement of this [Civil Service] article and the rules and ordinances adopted in accordance therewith that may be referred to it for decision by the director [of personnel], or on appeal by any appointing authority, employe, or taxpayer of the city, from any act of the director or of any appointing authority. The decision of the commission in all such matters shall be final, subject, however, to any right of action under any law of the state or of the United States." St. Louis City Charter, Art. XVIII, § 7(d), App. 63.

This case therefore resembles the hypothetical example in *Pembaur:* "[I]f [city] employment policy was set by the

[Mayor and Aldermen and by the Civil Service Commission], only [those] bod[ies'] decisions would provide a basis for [city] liability. This would be true even if the [Mayor and Aldermen and the Commission] left the [appointing authorities] discretion to hire and fire employees and [they] exercised that discretion in an unconstitutional manner . . . ." 475 U. S., at 483, n. 12. A majority of the Court of Appeals panel determined that the Civil Service Commission's review of individual employment actions gave too much deference to the decisions of appointing authorities like Hamsher and Killen. Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker. It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. See *supra,* at 127. In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower ranking official. But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy.

JUSTICE BRENNAN's opinion, concurring in the judgment, finds implications in our discussion that we do not think necessary or correct. See *post,* at 142–147. We nowhere say or imply, for example, that "a municipal charter's precatory

admonition against discrimination or any other employment practice not based on merit and fitness effectively insulates the municipality from any liability based on acts inconsistent with that policy." *Post*, at 145, n. 7. Rather, we would respect the decisions, embodied in state and local law, that allocate policymaking authority among particular individuals and bodies. Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced. If such a showing were made, we would be confronted with a different case than the one we decide today.

Nor do we believe that we have left a "gaping hole" in § 1983 that needs to be filled with the vague concept of *"de facto* final policymaking authority." *Post*, at 144. Except perhaps as a step towards overruling *Monell* and adopting the doctrine of *respondeat superior*, ad hoc searches for officials possessing such *"de facto"* authority would serve primarily to foster needless unpredictability in the application of § 1983.

## IV

We cannot accept either the Court of Appeals' broad definition of municipal policymakers or respondent's suggestion that a jury should be entitled to define for itself which officials' decisions should expose a municipality to liability. Respondent has suggested that the record will support an inference that policymaking authority was in fact delegated to individuals who took retaliatory action against him and who were not exonerated by the jury. Respondent's arguments appear to depend on a legal standard similar to the one suggested in JUSTICE STEVENS' dissenting opinion, *post*, at 171, which we do not accept. Our examination of the record and state law, however, suggests that further review of this case may be warranted in light of the principles we have discussed. That task is best left to the Court of Appeals, which will be free to invite additional briefing and argument if necessary. Accordingly, the decision of the Court of Appeals is

reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in the judgment.

Despite its somewhat confusing procedural background, this case at bottom presents a relatively straightforward question: whether respondent's supervisor at the Community Development Agency, Frank Hamsher, possessed the authority to establish final employment policy for the city of St. Louis such that the city can be held liable under 42 U. S. C. § 1983 for Hamsher's allegedly unlawful decision to transfer respondent to a dead-end job. Applying the test set out two Terms ago by the plurality in *Pembaur* v. *Cincinnati,* 475 U. S. 469 (1986), I conclude that Hamsher did not possess such authority and I therefore concur in the Court's judgment reversing the decision below. I write separately, however, because I believe that the commendable desire of today's plurality to "define more precisely when a decision on a single occasion may be enough" to subject a municipality to § 1983 liability, *ante,* at 123, has led it to embrace a theory of municipal liability that is both unduly narrow and unrealistic, and one that ultimately would permit municipalities to insulate themselves from liability for the acts of all but a small minority of actual city policymakers.

I

Respondent James H. Praprotnik worked for petitioner city of St. Louis for 15 years. A licensed architect, he began his career in 1968 as city planner and by 1980 had risen to a mid-level management position in the city's Community Development Agency (CDA), garnering consistently high job evaluations, substantial pay raises, and rapid promotions

during the intervening 12 years. 1980, however, marked the turning point in respondent's fortunes as a civil servant. In April of that year, his supervisor, Charles Kindleberger, suspended him for 15 days for failing to comply with a secondary employment policy that required all city professionals to obtain prior approval before undertaking any outside work. Respondent, who had objected to the policy since the head of the agency, CDA Director Donald Spaid, first announced it in 1978, appealed the suspension to the city's Civil Service Commission (CSC), arguing that the advance approval requirement was an improper invasion of his privacy and that in any event he had consistently complied with it. Although the CSC apparently did not question the validity of the policy, it found the penalty excessive, and therefore directed respondent's supervisors to reinstate him with backpay and to issue a letter of reprimand in lieu of the suspension.

Testimony at the trial below revealed that neither Spaid nor Kindleberger was pleased with respondent's actions, and that Spaid in particular was "very down on" respondent for his testimony before the CSC. 3 Record 1–54 to 1–55, 5 *id.*, at 3–237. In October 1980, just before the CSC rendered its decision, Kindleberger gave respondent an overall rating of "good" for the year, but recommended a two-step decrease in his salary. Kindleberger, who had just six months earlier proposed raising respondent's salary two grades, justified the reduction as part of a citywide pay scale reorganization. Respondent, however, viewed the recommendation as retaliation for his CSC appeal and petitioned the Department of Personnel for relief; the Department, which considers initial challenges to all performance ratings, granted partial relief, approving a one-step reduction, and the CSC affirmed this disposition on final appeal.

The following year witnessed a change in city administrations and the arrival of Frank Hamsher, who succeeded Spaid as CDA Director. Kindleberger, however, remained the supervisor responsible for respondent's performance

evaluation, and in October 1981 he rated respondent merely "adequate" overall. A confidential memorandum from one of respondent's superiors to Kindleberger explained that respondent did not get along well with others, citing as an example respondent's prior difficulties with former Director Spaid. Respondent, who had previously never received a rating of less than "good," again appealed to the Department of Personnel, which again ordered partial relief.

Six months later CDA underwent major budget and staff reductions and, as part of the resulting reorganization, Director Hamsher proposed transferring respondent's duties to the Heritage and Urban Design Commission (Heritage) and consolidating his functions with those of a vacant position at Heritage. Although there was testimony indicating that Heritage Commissioner Henry Jackson thought the transfer unnecessary, both Jackson and his superior, Director of Public Safety Thomas Nash, agreed to the consolidation, and the Director of Personnel formally approved the proposal. Respondent objected to the move and appealed to the CSC, but the CSC declined to review the decision, reasoning that because Heritage classified the consolidated position at the same grade as respondent's former job, the transfer was merely "lateral" and respondent had therefore suffered no "adverse" employment action. Thereafter, respondent filed this § 1983 suit against the city, Kindleberger, Hamsher, and Hamsher's successor at CDA, Deborah Patterson, alleging that the transfer violated his constitutional rights.[1]

In the meantime, Jackson took over many of the architectural tasks CDA had ostensibly transferred to the new position and assigned respondent mainly clerical duties, an arrangement the latter found highly unsatisfactory. In November 1982, Jackson rated respondent "inadequate" overall and recommended a one-step reduction in his salary, as well

---

[1] Respondent also initially named Heritage Commissioner Henry Jackson as a defendant, but later dropped him from the suit after the latter left city government and moved out of the jurisdiction.

as an overall reduction in the classification of his position. Respondent successfully appealed his performance rating to the Personnel Department, which again granted partial relief. Nonetheless, in March 1983 his position was substantially downgraded and by the summer of that year Jackson's successor at Heritage, Robert Killen, proposed abolishing the position altogether. In December 1983, Killen carried through on his plan and, with the approval of Public Safety Director Nash, laid respondent off. Respondent amended his complaint in the District Court to reflect the layoff and simultaneously appealed the action to the CSC, but the CSC stayed its proceedings in light of the pendency of this lawsuit.

At trial, respondent sought to prove that the individual defendants had transferred him and eventually laid him off in retaliation for his use of the city's grievance machinery, thereby violating his First Amendment and due process rights. For its part, the city contended that the individual defendants were not personally responsible for the alleged ills that had befallen respondent. Conspicuous by their absence, city counsel argued, were Donald Spaid, whose displeasure over respondent's testimony before the CSC was allegedly the motivating force behind respondent's first proposed grade reduction and allegedly infected later performance evaluations; Robert Killen, who initiated and ultimately authorized the elimination of respondent's position at Heritage; and Thomas Nash, who approved the layoff. Respondent's counsel, however, defended the choice of defendants as those "primarily responsible" for the constitutional deprivations. 6 id., at 4–56.

The District Court instructed the jury that generally a city is not liable under § 1983 for the acts of its employees, but that it may be held to answer for constitutional wrongs "committed by an official high enough in the government so that his or her actions can be said to represent a government decision." App. 113. In a lengthy and involved instruction, the court further advised the jury that it must find in favor of

respondent, and against the individual defendants, if it found six facts to be true, one of which was that "Hamsher and Kindleberger were personally involved in causing [respondent's] transfer and/or layoff." *Id.*, at 118. The jury exonerated the three individual defendants, but awarded respondent $15,000 on each of his constitutional claims against petitioner.

The Court of Appeals for the Eighth Circuit vacated the judgment entered on respondent's due process claim (a ruling not at issue here) but affirmed the judgment as to the First Amendment claim. 798 F. 2d 1168 (1986). With respect to this latter claim, the court reasoned that the city could be held accountable for an improperly motivated transfer and layoff if it had delegated to the responsible officials, either directly or indirectly, the authority to act on behalf of the city, and if the decisions made within the scope of this delegated authority were essentially final. Applying this test, the court noted that under the City Charter, "appointing authorities," or department heads, such as Hamsher, could undertake transfers and layoffs subject only to the approval of the Director of Personnel, who undertook no substantive review of such decisions and simply conditioned his approval on formal compliance with city procedures. Moreover, because the CSC engaged in highly circumscribed and deferential review of layoffs and, at least so far as this case reveals, no review whatever of lateral transfers, the court concluded that an appointing authority's transfer and layoff decisions were final. *Id.*, at 1174–1175.

Having found that Hamsher was a final policymaker whose acts could subject petitioner to § 1983 liability, the court determined that the jury had ample evidence from which it could find that Hamsher transferred respondent in retaliation for the latter's exercise of his First Amendment rights, and that the transfer in turn precipitated respondent's layoff. This constructive discharge theory, the majority found, also reconciled the jury's apparently inconsistent verdicts: the

jury could have viewed Hamsher's unlawful motivation as the proximate cause of respondent's dismissal but, because Nash and Killen administered the final blows, it could have concluded that Hamsher, Kindleberger, and Patterson were not "personally involved" in the layoff as required by the instructions; accordingly, the jury could have reasonably exonerated the individual defendants while finding the city liable. *Id.*, at 1176, and n. 8.[2]

## II

In light of the jury instructions below, the central question before us is whether the city delegated to CDA Director Frank Hamsher the authority to establish final employment policy for the city respecting transfers. For if it did not, then his allegedly unlawful decision to move respondent to an unfulfilling, dead-end position is simply not an act for which the city can be held responsible under § 1983. I am constrained to conclude that Hamsher possessed no such policy-making power here, and that, on the contrary, his allegedly retaliatory act simply constituted an abuse of the discretionary authority the city had entrusted to him.

The scope of Hamsher's authority with respect to transfers derives its significance from our determination in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), that a municipality is not liable under § 1983 for each and every wrong committed by its employees. In rejecting the concept of vicarious municipal liability, we emphasized that

---

[2] The instruction in question directed the jury to find in favor of respondent and against the individual defendants if it found, among other things, that Hamsher and Kindleberger "were personally involved in causing [respondent's] transfer and/*or* layoff." App. 118 (emphasis added). Although Hamsher was personally involved in the transfer, the Court of Appeals found the phrase "and/or" confusing and thus decided that the jury must have understood it to mean simply "and." 798 F. 2d, at 1172–1173, n. 3. Because I believe Hamsher was not a final policymaking official, I find it unnecessary to decide whether the court below properly construed the jury instructions or to determine whether the jury's verdicts were in fact inconsistent.

"the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for the deprivation of rights protected by the Constitution." *Id.*, at 690. More recently we have explained that the touchstone of "official policy" is designed "to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur* v. *Cincinnati*, 475 U. S., at 479–480 (emphasis in original).

Municipalities, of course, conduct much of the business of governing through human agents. Where those agents act in accordance with formal policies, or pursuant to informal practices "so permanent and well settled as to constitute a 'custom or usage' with the force of law," *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 167–168 (1970), we naturally ascribe their acts to the municipalities themselves and hold the latter responsible for any resulting constitutional deprivations. *Monell*, which involved a challenge to a citywide policy requiring all pregnant employees to take unpaid leave after their fifth month of pregnancy, was just such a case. Nor have we ever doubted that a single decision of a city's properly constituted legislative body is a municipal act capable of subjecting the city to liability. See, *e. g., Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247 (1981) (City Council canceled concert permit for content-based reasons); *Owen* v. *City of Independence*, 445 U. S. 622 (1980) (City Council passed resolution firing Police Chief without any pretermination hearing). In these cases we neither required nor, as the plurality suggests, assumed that these decisions reflected generally applicable "policies" as that term is commonly understood, because it was perfectly obvious that the actions of the municipalities' policymaking organs, whether isolated or not, were properly charged to the municipalities them-

selves.[3] And, in *Pembaur* we recognized that "the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level," 475 U. S., at 480, and that the isolated decision of an executive municipal policymaker, therefore, could likewise give rise to municipal liability under § 1983.

In concluding that Frank Hamsher was a policymaker, the Court of Appeals relied on the fact that the city had delegated to him "the authority, either directly or indirectly, to act on [its] behalf," and that his decisions within the scope of this delegated authority were effectively final. 798 F. 2d, at 1174. In *Pembaur*, however, we made clear that a municipality is not liable merely because the official who inflicted the constitutional injury had the final authority to *act* on its behalf; rather, as four of us explained, the official in question must possess "final authority to establish municipal policy with respect to the [challenged] action." 475 U. S., at 481. Thus, we noted, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to munici-

---

[3] The plurality's suggestion that in *Owen* and *Fact Concerts* we "*assumed* that an unconstitutional governmental policy could be *inferred* from a single decision," see *ante*, at 123 (emphasis added), elevates the identification of municipal policy from touchstone to talisman. Section 1983 imposes liability where a municipality "subjects [a person], or causes [a person] to be subjected . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." Our decision in *Monell*, interpreting the statute to require a showing that such deprivations arise from municipal policy, did not employ the policy requirement as an end in itself, but rather as a means of determining which acts by municipal employees are properly attributed to the municipality. Congress, we held, did not intend to subject cities to liability simply because they employ tortfeasors. But where a municipality's governing legislative body inflicts the constitutional injury, the municipal policy inquiry is essentially superfluous: the city is liable under the statute whether its decision reflects a considered policy judgment or nothing more than the bare desire to inflict harm.

pal liability based on an exercise of that discretion." *Id.*, at 481–482. By way of illustration, we explained that if, in a given county, the Board of County Commissioners established county employment policy and delegated to the County Sheriff alone the discretion to hire and fire employees, the county itself would not be liable if the Sheriff exercised this authority in an unconstitutional manner, because "the decision to act unlawfully would not be a decision of the Board." *Id.*, at 483, n. 12. We pointed out, however, that in that same county the Sheriff could be the final policymaker in other areas, such as law enforcement practices, and that if so, his or her decisions in such matters *could* give rise to municipal liability. *Ibid.* In short, just as in *Owen* and *Fact Concerts* we deemed it fair to hold municipalities liable for the isolated, unconstitutional acts of their legislative bodies, regardless of whether those acts were meant to establish generally applicable "policies," so too in *Pembaur* four of us concluded that it is equally appropriate to hold municipalities accountable for the isolated constitutional injury inflicted by an executive final municipal policymaker, even though the decision giving rise to the injury is not intended to govern future situations. In either case, as long as the contested decision is made in an area over which the official or legislative body *could* establish a final policy capable of governing future municipal conduct, it is both fair and consistent with the purposes of § 1983 to treat the decision as that of the municipality itself, and to hold it liable for the resulting constitutional deprivation.

In my view, *Pembaur* controls this case. As an "appointing authority," Hamsher was empowered under the City Charter to initiate lateral transfers such as the one challenged here, subject to the approval of both the Director of Personnel and the appointing authority of the transferee agency. The Charter, however, nowhere confers upon

agency heads any authority to establish city *policy*, final or otherwise, with respect to such transfers. Thus, for example, Hamsher was not authorized to promulgate binding guidelines or criteria governing how or when lateral transfers were to be accomplished. Nor does the record reveal that he in fact sought to exercise any such authority in these matters. There is no indication, for example, that Hamsher ever purported to institute or announce a practice of general applicability concerning transfers. Instead, the evidence discloses but one transfer decision—the one involving respondent—which Hamsher ostensibly undertook pursuant to a citywide program of fiscal restraint and budgetary reductions. At most, then, the record demonstrates that Hamsher had the authority to determine how best to *effectuate* a policy announced by his superiors, rather than the power to *establish* that policy. Like the hypothetical Sheriff in *Pembaur*'s n. 12, Hamsher had discretionary authority to transfer CDA employees laterally; that he may have used this authority to punish respondent for the exercise of his First Amendment rights does not, without more, render the city liable for respondent's resulting constitutional injury.[4] The court below did not suggest that either Killen or Nash, who together orchestrated respondent's ultimate layoff,

---

[4] While the Court of Appeals erred to the extent it equated the authority to act on behalf of a city with the power to establish municipal policy, in my view the lower court quite correctly concluded that the CSC's highly circumscribed and deferential review of Hamsher's decisions in no way rendered those decisions less than final. We of course generally accord great deference to the interpretation and application of state law by the courts of appeals, see *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 500 (1985); *United States* v. *Varig Airlines*, 467 U. S. 797, 815, n. 12 (1984), and that deference is certainly applicable to the Court of Appeals' assessment of the scope of CSC review. Moreover, the facts of this case reveal that the CSC believed it lacked the authority to review lateral transfers. Accordingly, had Hamsher actually possessed policymaking authority with respect to such decisions, I would have little difficulty concluding that such authority was final. See *infra* at, 145–146.

shared Hamsher's constitutionally impermissible animus. Because the court identified only one unlawfully motivated municipal employee involved in respondent's transfer and layoff, and because that employee did not possess final policymaking authority with respect to the contested decision,[5] the city may not be held accountable for any constitutional wrong respondent may have suffered.

## III

These determinations, it seems to me, are sufficient to dispose of this case, and I therefore think it unnecessary to decide, as the plurality does, who the actual policymakers in St. Louis are. I question more than the mere necessity of these determinations, however, for I believe that in the course of passing on issues not before us, the plurality announces legal principles that are inconsistent with our earlier cases and unduly restrict the reach of § 1983 in cases involving municipalities.

The plurality begins its assessment of St. Louis' power structure by asserting that the identification of policymaking officials is a question of state law, by which it means that the question is neither one of federal law nor of fact, at least "not . . . in the usual sense." See *ante*, at 124. Instead, the plurality explains, courts are to identify municipal policymakers

---

[5] I am unable to agree with JUSTICE STEVENS that the record provides sufficient evidence of complicity on the part of other municipal policymakers such that we may sustain the jury's verdict against petitioner on a conspiracy theory neither espoused nor addressed by the court below. JUSTICE STEVENS' dissent relies to a large extent on respondent's controversial public testimony about the Serra sculpture, and the unwelcome reception that testimony drew in the Mayor's office. See *post*, at 149–155. Whatever else may be said about the strength of this evidence, however, the dissent's reliance on it is flawed in one crucial respect: the jury instructions concerning respondent's First Amendment claim refer exclusively to the exercise of his appellate rights before the CSC and make no mention whatever of his public testimony. Under these circumstances, the jury was simply not at liberty to impose liability against petitioner based on the allegedly retaliatory actions of the Mayor and his close associates; thus we may not sustain its verdict on the basis of such evidence.

by referring exclusively to applicable state statutory law. *Ibid.* Not surprisingly, the plurality cites no authority for this startling proposition, nor could it, for we have never suggested that municipal liability should be determined in so formulaic and unrealistic a fashion. In any case in which the policymaking authority of a municipal tortfeasor is in doubt, state law will naturally be the appropriate starting point, but ultimately the factfinder must determine where such policymaking authority actually resides, and not simply "where the applicable law purports to put it." *Ante,* at 126. As the plurality itself acknowledges, local governing bodies may take myriad forms. We in no way slight the dignity of municipalities by recognizing that in not a few of them real and apparent authority may diverge, and that in still others state statutory law will simply fail to disclose where such authority ultimately rests. Indeed, in upholding the Court of Appeals' determination in *Pembaur* that the County Prosecutor was a policymaking official with respect to county law enforcement practices, a majority of this Court relied on testimony which revealed that the County Sheriff's office routinely forwarded certain matters to the Prosecutor and followed his instructions in those areas. See 475 U. S., at 485; *ibid.* (WHITE, J., concurring); *id.,* at 491 (O'CONNOR, J., concurring). While the majority splintered into three separate camps on the ultimate theory of municipal liability, and the case generated five opinions in all, not a single Member of the Court suggested that reliance on such extrastatutory evidence of the county's actual allocation of policymaking authority was in any way improper. Thus, although I agree with the plurality that juries should not be given open-ended "*discretion* to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself," *ante,* at 126 (emphasis added), juries can and must find the predicate facts necessary to a determination whether a given official possesses final policymaking authority. While the jury instructions in this case were regrettably vague, the plurality's solution tosses

the baby out with the bath water. The identification of municipal policymakers is an essentially factual determination "in the usual sense," and is therefore rightly entrusted to a properly instructed jury.

Nor does the "custom or usage" doctrine adequately compensate for the inherent inflexibility of a rule that leaves the identification of policymakers exclusively to state statutory law. That doctrine, under which municipalities and States can be held liable for unconstitutional practices so well settled and permanent that they have the force of law, see *Adickes* v. *S. H. Kress & Co.*, 398 U. S., at 167, has little if any bearing on the question whether a city has delegated *de facto* final policymaking authority to a given official. A city practice of delegating final policymaking authority to a subordinate or mid-level official would not be unconstitutional in and of itself, and an isolated unconstitutional act by an official entrusted with such authority would obviously not amount to a municipal "custom or usage." Under *Pembaur*, of course, such an isolated act *should* give rise to municipal liability. Yet a case such as this would fall through the gaping hole the plurality's construction leaves in § 1983, because state statutory law would not identify the municipal actor as a policymaking official, and a single constitutional deprivation, by definition, is not a well-settled and permanent municipal practice carrying the force of law.[6]

For these same reasons, I cannot subscribe to the plurality's narrow and overly rigid view of when a municipal official's policymaking authority is "final." Attempting to place a gloss on *Pembaur*'s finality requirement, the plurality suggests that whenever the decisions of an official are subject to

---

[6] Indeed, the plurality appears to acknowledge as much when it explains that the "custom or usage" doctrine will forestall *"egregious* attempts by local governments to insulate themselves from liability for unconstitutional policies," and that *"most* deliberate municipal evasions of the Constitution will be sharply limited." *Ante*, at 127 (emphases added). Congress, however, did not enact § 1983 simply to provide redress for "most" constitutional deprivations, nor did it limit the statute's reach only to those deprivations that are truly "egregious."

some form of review—however limited—that official's decisions are nonfinal. Under the plurality's theory, therefore, even where an official wields policymaking authority with respect to a challenged decision, the city would not be liable for that official's policy decision unless *reviewing* officials affirmatively approved both the "decision and the basis for it." *Ante*, at 127. Reviewing officials, however, may as a matter of practice never invoke their plenary oversight authority, or their review powers may be highly circumscribed. See n. 4, *supra*. Under such circumstances, the subordinate's decision is in effect the final municipal pronouncement on the subject. Certainly a § 1983 plaintiff is entitled to place such considerations before the jury, for the law is concerned not with the niceties of legislative draftsmanship but with the realities of municipal decisionmaking, and any assessment of a municipality's actual power structure is necessarily a factual and practical one.[7]

Accordingly, I cannot endorse the plurality's determination, based on nothing more than its own review of the City Charter, that the Mayor, the Aldermen, and the CSC are the only policymakers for the city of St. Louis. While these offi-

---

[7]The plurality also asserts that "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Ante*, at 127. While I have no quarrel with such a proposition in the abstract, I cannot accept the plurality's apparent view that a municipal charter's precatory admonition against discrimination or any other employment practice not based on merit and fitness effectively insulates the municipality from any liability based on acts inconsistent with that policy. Again, the relevant inquiry is whether the policy in question is actually and effectively enforced through the city's review mechanisms. Thus in this case, a policy prohibiting lateral transfers for unconstitutional or discriminatory reasons would not shield the city from liability if an official possessing final policymaking authority over such transfers acted in violation of the prohibition, because the CSC would lack jurisdiction to review the decision and thus could not enforce the city policy. Where as here, however, the official merely possesses discretionary authority over transfers, the city policy is irrelevant, because the official's actions cannot subject the city to liability in any event.

cials may well have policymaking authority, that hardly ends the matter; the question before us is whether the officials responsible for respondent's allegedly unlawful transfer were final policymakers. As I have previously indicated, I do not believe that CDA Director Frank Hamsher possessed any policymaking authority with respect to lateral transfers and thus I do not believe that his allegedly improper decision to transfer respondent could, without more, give rise to municipal liability. Although the plurality reaches the same result, it does so by reasoning that because others could have reviewed the decisions of Hamsher and Killen, the latter officials simply could not have been final policymakers.

This analysis, however, turns a blind eye to reality, for it ignores not only the lower court's determination, nowhere disputed, that CSC review was highly circumscribed and deferential, but also the fact that in this very case the CSC *refused* to judge the propriety of Hamsher's transfer decision because a lateral transfer was not an "adverse" employment action falling within its jurisdiction. Nor does the plurality account for the fact that Hamsher's predecessor, Donald Spaid, promulgated what the city readily acknowledges was a binding policy regarding secondary employment;[8] although the CSC ultimately modified the sanctions respondent suffered as a result of his apparent failure to comply with that policy, the record is devoid of any suggestion that the CSC reviewed the substance or validity of the policy itself. Under the plurality's analysis, therefore, even the hollowest promise of review is sufficient to divest all city officials save the mayor and governing legislative body of final policymaking authority. While clarity and ease of application may

---

[8] Although the plurality is careful in its discussion of the facts to label Director Spaid's directive a "requirement" rather than a "policy," the city itself draws no such fine semantic distinctions. Rather, it states plainly that Spaid "promulgated a 'secondary employment' *policy* that sought to control outside employment by CDA architects," and that "[respondent] resented the policy . . . ." Brief for Petitioner 2–3 (emphasis added).

commend such a rule, we have remained steadfast in our conviction that Congress intended to hold municipalities accountable for those constitutional injuries inflicted not only by their lawmakers, but also "by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U. S., at 694. Because the plurality's mechanical "finality" test is fundamentally at odds with the pragmatic and factual inquiry contemplated by *Monell*, I cannot join what I perceive to be its unwarranted abandonment of the traditional factfinding process in § 1983 actions involving municipalities.

Finally, I think it necessary to emphasize that despite certain language in the plurality opinion suggesting otherwise, the Court today need not and therefore does not decide that a city can only be held liable under § 1983 where the plaintiff "prove[s] the existence of an unconstitutional municipal policy." See *ante*, at 128. Just last Term, we left open for the second time the question whether a city can be subjected to liability for a policy that, while not unconstitutional in and of itself, may give rise to constitutional deprivations. See *Springfield* v. *Kibbe*, 480 U. S. 257 (1987); see also *Oklahoma City* v. *Tuttle*, 471 U. S. 808 (1985). That question is certainly not presented by this case, and nothing we say today forecloses its future consideration.

## IV

For the reasons stated above, I concur in the judgment of the Court reversing the decision below and remanding the case so that the Court of Appeals may determine whether respondent's layoff resulted from the actions of any improperly motivated final policymakers.

JUSTICE STEVENS, dissenting.

If this case involved nothing more than a personal vendetta between a municipal employee and his superiors, it would be quite wrong to impose liability on the city of St. Louis. In fact, however, the jury found that top officials in the city administration, relying on pretextual grounds, had taken a se-

ries of retaliatory actions against respondent because he had testified truthfully on two occasions, one relating to personnel policy and the other involving a public controversy of importance to the Mayor and the members of his cabinet. No matter how narrowly the Court may define the standards for imposing liability upon municipalities in § 1983 litigation, the judgment entered by the District Court in this case should be affirmed.

In order to explain why I believe that affirmance is required by this Court's precedents,[1] it is necessary to begin with a more complete statement of the disputed factual issues that the jury resolved in respondent's favor, and then to comment on the procedural posture of the case. Finally, I shall discuss the special importance of the character of the wrongful conduct disclosed by this record.

I

The city of St. Louis hired respondent as a licensed architect in 1968. During the ensuing decade, he was repeatedly

---

[1] This would, of course, be an easy case if the Court disavowed its dicta in Part II of the opinion in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 691–695 (1978). See *id.*, at 714 (STEVENS, J., concurring in part). Like many commentators who have confronted the question, I remain convinced that Congress intended the doctrine of *respondeat superior* to apply in § 1983 litigation. See *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 834–844 (1985) (STEVENS, J., dissenting); *Pembaur* v. *Cincinnati*, 475 U. S. 469, 489, n. 4 (1986) (STEVENS, J., concurring in part and concurring in judgment); see also Whitman, Government Responsibility for Constitutional Torts, 85 Mich. L. Rev. 225, 236, n. 43 (1986). Given the Court's reiteration of the contrary *ipse dixit* in *Monell* and subsequent opinions, however, see *Oklahoma City* v. *Tuttle, supra*, at 818; *Pembaur* v. *Cincinnati, supra*, at 477–480, I shall join the Court's attempt to draw an intelligible boundary between municipal agents' actions that bind and those that do not. Since it represents a departure from Congress' initial intention that *respondeat superior* principles apply in this context, this endeavor necessarily involves the Court in some consideration of "new theory," see *ante*, at 125, n. 2 (plurality). Even so, we should be guided by the congressional purposes that motivated the enactment of § 1983 rather than by a nonstatutory judge-made presumption that gives "extremely wide latitude" to a profusion of "local preferences." *Ante*, at 124.

promoted and consistently given "superior" performance ratings. In April 1980, while serving as the Director of Urban Design in the Community Development Agency (CDA), he was recommended for a two-step salary increase by his immediate superior. See 3 Record 1–51.

Thereafter, on two occasions he gave public testimony that was critical of official city policy. In 1980 he testified before the Civil Service Commission (CSC) in support of his successful appeal from a 15-day suspension. In that testimony he explained that he had received advance oral approval of his outside employment and voiced his objections to the requirement of prior written approval.[2] The record demonstrates

---

[2] "Q. [Mr. Oldham, respondent's attorney] Mr. Praprotnik, during this period of time, was there a salary limit on salaries imposed by the City Charter?

"A. [Mr. Praprotnik] Yes. It was established at $25,000 annually.

"Q. All right. And were employees in CDA permitted to have secondary employment—

"A. Yes, they were.

.        .        .        .        .

"Q. And were you required to fill out any particular type of form or document?

"A. Yes. We had to fill out an employee secondary employment questionnaire on an annual basis at the time of our review of our service rating.

"Q. Now, did you fill out a secondary employment form?

"A. Yes, I did, for each year.

"Q. Now. Were you then at any time suspended for a matter involving the secondary employment?

"A. Yes. I was suspended in April, April 29th, 1980, for failure to provide information to my immediate supervisors.

"Q. And did you provide that information to your immediate supervisors?

"A. Yes, I did.

"Q. Did you fill out a form which gave, in detail, the places where you had worked?

"A. Yes. As had always been required in the past, I had filled out the questionnaire and submitted it each year explaining that I had practiced architecture.

that this testimony offended his immediate superiors at the CDA.[3]

In 1981 respondent testified before the Heritage and Urban Design Commission (HUD) in connection with a pro-

---

"Q. Now, after you were suspended, did you take any action to protest that suspension or petition anybody for correction of the action taken against you?

"A. Yes. I had appealed that to the Civil Service Commission.

.        .        .        .        .

"Q. And after the hearing, was there a decision by the Commission?

"A. Yes. The Commission had ruled in favor of myself.

"Q. Could you tell me what your length of suspension was?

"A. It was for fifteen days.

"Q. And were you reinstated with back pay?

"A. Yes, I was." 3 Record 1–45—1–47.

"A. [Mr. Praprotnik to Ms. Ronzio, petitioner's attorney] I had been singled out to provide this information. No one else, as was—in the Civil Service Commission, no one else was asked to do this, to provide the listing of clients. And this was—and I had indicated the reason for that, because of the standards of ethical practice." 4 id., at 2–35.

[3] "Q. [Mr. Oldham] And in this rating, what recommendation is made for you?

"A. [Mr. Praprotnik] This recommendation is—this is October 30th, 1980. This is a recommendation for a two-step decrease in salary.

"Q. Did you ever discuss with Mr. Kindleberger [Director of Planning, CDA] the reason why you were given two ratings on almost the same day, one for no change and one for a two-step decrease?

"A. Yes. I could not understand, you know, with the same evaluation performance being similar, that—at one point the recommendation of a two-step increase—and this occurring shortly thereafter with a two-step decrease.

"Q. All right. What did Mr. Kindleberger say to you about that?

"A. At the time, it was that, 'The director, Mr. Spaid [Director, CDA, until April, 1981], is very down on you.' That was his exact words.

"Q. Did he tell you why he was down on you?

"A. He stated that I had lied before the Commission, the Civil Service Commission." 3 id., at 1–54—1–55.

"A. [Mr. Kindleberger to Ms. Ronzio] I guess I was somewhat irritated at the whole process at this point. And I thought that Mr. Praprotnik had gotten an adequate rating and that he was being dealt with fairly and that he was not being as cooperative as he might. I also thought, and still believe, that the process for appealing a rating was one that involved

posal to acquire a controversial rusting steel sculpture by
Richard Serra.   In his testimony he revealed the previously
undisclosed fact that an earlier city administration had re-
jected an offer to acquire the same sculpture, and also ex-
plained that the erection of the sculpture would require the
removal of structures on which the city had recently ex-
pended about $250,000.[4]   This testimony offended top offi-

---

the Department of Personnel looking at the rating and participating in
some kind of conciliatory procedures of the kind that were described earlier
by Mr. Duffe [City Director of Personnel], whereby an attempt was made
to get the individual that was unsatisfied and the supervisor together and
get them talking to each other.   And that after that, if there was still
dissatisfaction, there was a process of going through the Civil Service
Commission.   And I thought it was inappropriate for Jim Praprotnik and
his lawyer to get involved before it got over to the Department of Person-
nel and I told that to Mr. Brewster [Deputy Director, CDA]." 5 *id.*, at
3–230—3–231.

"Q. [Mr. Oldham]   Did Mr. Spaid say something to the effect that he
was down on Praprotnik?

"A. [Mr. Kindleberger]   That sounds right.

"Q. And that he felt he had not been honest, had not testified honestly at
the Civil Service Commission, or words to that effect?

"A. I don't know if Mr. Spaid said it, but I know I felt it at the time." 5
*id.*, at 3–237.

See also 3 *id.*, at 1–57, 1–58, 1–60, 1–66, 4 *id.*, at 2–94, 2–141.

[4] "Q. [Mr. Oldham]   I want to direct your attention to a period which
involved a discussion of the Serra sculpture.   Does that refresh your mem-
ory or do you have a recollection of that incident?

"A. [Mr. Praprotnik]   Yes, I do.

"Q. What—could you tell me approximately when this incident
occurred?

"A. This was immediately prior to the erection of the rusting steel sculp-
ture which we have right out here on Market Street, the erection of that.
And it was a meeting of the Heritage and Urban Design Commission of
which I served as liaison from the Community Development Agency.

"Q. Were you requested to testify before the Commission?

"A. Yes, I was requested by the chairperson of that Commission.

"Q. And were you required to make some comment on the Serra sculp-
ture and its appropriateness at that spot?

cials of the city government, possibly including the Mayor, who supported the acquisition of the Serra sculpture, as well as respondent's agency superiors.[5] They made it perfectly

"A. That's correct. I was. And whether it conformed to the overall plan for the Gateway Mall, the center open space all the way down to the courthouse." 4 *id.*, at 2–3—2–4.

"Q. [Mr. Oldham] Do you know anything about the time that Mr. Praprotnik appeared before the Commission in regard to testimony involving the Serra sculpture?

"A. [Ms. Buckley, Chairperson, HUD] Yes, I do because I asked him to attend that meeting of the Commission.

.           .           .           .           .

"Mr. Praprotnik appeared and this was the first time I had seen him in this capacity. This was at this committee meeting of the Commission. He stated that the City had been presented the Serra sculpture once before. The people who were presenting it said this was the first time it was being presented to the City.

.           .           .           .           .

"Q. Could you describe who was present in the hearing room and the amount of interest there was in regard to the Serra sculpture?

"A. There was a great deal of interest. The hearing room was always filled because there were so many applicants of people *[sic]* who had projects they wanted to bring. But whenever something came in—

"Q. Was the mayor's office in there, too?

"A. I don't know all the people in the mayor's office but, yes, I knew from the whispering around me and from some of the faces that were familiar that, yes, these were the mayor's people, or at least the City people who came in to watch." 4 *id.*, at 2–88—2–90.

[5] "Q. [Mr. Oldham] All right. Now, after you testified before the Commission, did you have any conversation with Mr. Hamsher [Director, CDA, when respondent was transferred; elevated to Deputy Director of Development, Mayor's Office, in June, 1982, and present at that position when respondent was laid off]?

"A. [Mr. Praprotnik] Yes. I was called into the office immediately after that meeting the following morning. And together with Mr. Hamsher and also Mr. Kindleberger, was told that certain information that I had stated at that Commission meeting that I should have 'muffed it.'

"Q. You shouldn't have—

"A. Meaning that I should have concealed it, you know, from their— from exposure to the Commission.

clear that they believed that respondent had violated a duty of loyalty to the Mayor by expressing his personal opinion about the sculpture. Thus, defendant Hamsher testified:

"Q. What information was Mr. Hamsher talking about?

"A. This was regarding the City's original expenditure of funds for that block amounting to an open space grant of approximately $250,000 to develop the block originally, and the City was going to remove all of that for erection of this rusting steel sculpture.

. . . . .

"Q. Did that discussion result—was that discussion one of the factors that was used in your service rating?

"A. Yes, it was." 4 *id.*, at 2-4—2-6.

"Q. [Mr. Oldham] You did rate him on the Serra sculpture?

"A. [Mr. Karetski, Deputy City Planning Director, CDA] That was a factor, yes." 5 *id.*, at 3-45.

"Q. [Ms. Ronzio] [L]et me make a break at this point and ask you about something that happened while Mr. Praprotnik was at the Community Development Agency. There's been some discussion of the Serra sculpture incident?

"A. [Mr. Hamsher] Yes.

"Q. Did you have occasion to reprimand Mr. Praprotnik for something he said concerning the Serra sculpture, the rusting steel sculpture as someone described it, downtown here?

"A. I don't know that reprimand is the right term. I did have a discussion about something that occurred on that sculpture, yes.

"Q. Did you indicate you were displeased with what he had done?

"A. Yes, I did.

"Q. Will you tell us what it was you had the discussion with him about and what you were upset about?

"A. Yes. I read in the newspaper one morning that Mr. Praprotnik was quoted, something about his personal opinion about the merit or lack of merit of the sculpture. And I was concerned about that because a decision had been made by the City administration that we all worked for, that we wanted to recommend—that the City administration wanted to recommend the installation of the Serra sculpture.

"I happened to disagree with the decision myself. I'm not fond of the sculpture and wasn't then. But the mayor was elected by the people and he made the decision. He was going to support the installation of the sculpture.

"Therefore, it was my responsibility and the responsibility of others who worked for my agency to do so as well and not to express personal opinions

"I'm not fond of the sculpture and wasn't then. But the mayor was elected by the people and he made the decision. He was going to support the installation of the sculpture.

"Therefore, it was my responsibility and the responsibility of others who worked for my agency to do so

in public forums about what that sculpture was going to be and what it would look like.

"Q. Did you take any disciplinary actions such as suspension or reduction in pay?

"A. No, I did not. I believe I sent Mr. Praprotnik a note about it to make him understand that I thought this was important, but that's all my recollection was and I had a discussion with him. But I didn't take any personnel action about it. Frankly, I didn't give any further thought to it." 5 *id.*, at 3–179—3–181.

"Q. [Mr. Oldham] Did you know that Mr. Praprotnik had been requested to appear before the Heritage and Urban Design Committee?

"A. [Mr. Kindleberger] I think I did.

"Q. Is it an obligation of a City employee who is requested to testify before one of these commissions to enter *[sic]* honestly and truthfully?

"A. Well, I think the obligation for a senior management individual is to represent fairly the position of his boss which, in our case, happens to be the mayor. And I would—I just think that is something that is appropriate for senior management to do.

"Q. Now, when he was asked whether or not this had been presented to the City before and he said that it had—

"A. Well, obviously, any questions of fact, one should be truthful.

"Q. And if he's asked his professional opinion, what should he do?

"A. Well, if someone is asked their own personal, professional opinion, they should render it. But one has to be awfully careful that you don't somehow imply that is the staff's opinion or that is the agency's opinion. And I think it's a question of judgment, but that is one of the things that senior managers need to have is judgment.

"Q. The mayor was quite upset; wasn't he?

"A. I don't know that for a fact. He never spoke to me about it.

"Q. Isn't it true the Pulitzer family was very interested in this? .

"A. The Serra sculpture?

"Q. Yes.

"A. Emily Pulitzer is a person who has long wanted that sculpture.

"Q. She is connected with the *Post-Dispatch?*

"A. I believe she is married to the publisher." 5 *id.*, at 3–249—3–251.

as well and not to express personal opinions in public forums about what that sculpture was going to be and what it would look like." 5 *id.*, at 3–180.

Defendant Kindleberger made the same point:

"Well, I think the obligation for a senior management individual is to represent fairly the position of his boss which, in our case, happens to be the mayor. And I would — I just think that is something that is appropriate for senior management to do." 5 *id.*, at 3–250.

After this testimony respondent was the recipient of a series of adverse personnel actions that culminated in his transfer from an important management-level professional position to a rather menial assignment for which he was "grossly over qualified," 3 *id.*, at 1–80, and his eventual layoff.[6] In

---

[6] "Q. [Mr. Oldham] I'd like to direct your attention to March of 1982. Was that the period of time that there was a transfer?

"A. [Mr. Praprotnik] Yes. [O]n March 23rd, I was called to the director's office, Mr. Frank Hamsher, and was told that I would be transferred to the Heritage and Urban Design Commission. And this was two weeks prior to the pending layoff recommendations at the agency."

. . . . .

"Q. Did [Mr. Jackson, Commissioner, HUD] make any statement to you as to whether he had sought your services?

"A. Yes. He stated that he didn't want me in the first place, that he had requested a historic preservation planner for that position, which was several grades below my management position level."

. . . . .

"Q. Now, just prior to [the then unknown attempt to fire respondent, one year prior to his actual dismissal], did you receive a rating?

"A. Yes, I did, in October [1982].

"Q. Let me hand you that rating, which is Plaintiff's Exhibit 92, and ask you to look at the second page thereof. In that rating, does it make any statement about your qualifications or your overqualifications for the position?

"A. Yes. It states in the paragraph related to 'Have the duties in the employee's position changed significantly during this rating period,' it states — Mr. Jackson places in this space: 'Mr. Praprotnik's former position was as a supervisor at CDA . . . which included administration of his unit

preparing respondent's service ratings after the Serra sculpture incident, his superiors followed a "highly unusual" procedure that may have violated the city's personnel regulations.[7]  Moreover, management officials who were involved in implementing the decision to transfer respondent to a menial assignment made it clear that "there was no reason" for the transfer—except, it would seem, for the possible con-

---

and supervision of staff.    In his new capacity here, there is no supervision of any professional staff and, in fact, the original vacancy was for an historic preservation planner I or II and which is intended to function as a junior staff position to existing staff and for which Mr. Praprotnik is grossly overqualified.'"  3 id., at 1–66—1–67, 1–71, 1–79—1–80.

"Q. [Mr. Oldham]    Would you describe [Mr. Praprotnik's tasks at HUD] as menial?

"A. [Ms. Buckley]   I would."  4 id., at 2–88.

[7] "Q. [Mr. Oldham]   Is he entitled to know the basis on which the service rating is given?

"A. [Mr. Brewster]   That is standard operating procedure, I think, in any management procedure.   Certainly, at CDA it was.

"Q. So this [Mr. Kindleberger's telling Mr. Brewster not to discuss the rating with Mr. Praprotnik] was unusual?

"A. I would say highly unusual.

"Q. After you made a study of the evaluation, what determinations did you make as to whether or not it had been properly and fairly done?

"A. As I recall, I found several discrepancies for which I did write a memo of finding on—I don't have it.

"Q. Can you recall, Mr. Brewster?   We have enough exhibits.   If you can recall from your own memory?

"A. Well, the substance of it, as I recall, would be that the so-called standards that they were rating Mr. Praprotnik on were standards that could not even be measured, either quantifiably or qualifiably.   So, therefore, there were not, in any actuality, they did not have any merit to them.

"And, as I recall, the two, Karetski, who was rater number one, and Kindleberger, who was rater number two, actually collaborated in the rating prior to the rating being done, which, in my estimation, was completely in violation of the City rules and regulations which specifically state that rater number one is not supposed to be influenced in his rating by any person."  4 id., at 2–106—2–107, 2–109.

nection with "the Serra sculpture incident."[8]   It is equally clear that the city's asserted basis for respondent's ultimate layoff in 1983—a lack of funds—was pretextual.[9]

Thus, evidence in the record amply supports the conclusion that respondent was first transferred and then laid off, not for fiscal and administrative reasons, but in retaliation for his public testimony before the CSC and HUD.[10]   It is undis-

---

[8] "Q. [Mr. Oldham]   Did you ever discuss Mr. Praprotnik with Mr. Jackson as to whether they needed his services in the facility?

"A. [Ms. Buckley]   I'll have to go back a minute to the Serra sculpture incident.   After that meeting, the major meeting where the Serra sculpture was approved by the Commission, unfortunately, it must have been two or three weeks or a month or so later that Mr. Jackson called me and said that Mr. Praprotnik was going to come over to the Heritage office.

"He expressed, I guess I would say, disappointment and displeasure at this, saying there was no need.

"On a separate occasion shortly after that, Mr. Killen also called me and said Mr. Praprotnik was coming and there was no reason for him to come." 4 id., at 2–90.

[9] "Q. [Mr. Oldham]   What's the total [HUD] budget for [1982] then?

"A. [Mr. Praprotnik]   The total budget for the year was $144,339.

.            .            .            .            .

"Q. And what is the total budget for [1984]?

"A. The total budget is a hundred and fifty thousand.

"Q. So there's an increase of approximately $6,000?

"A. Yes.

.            .            .            .            .

"Q. Now, what was the reason given for your layoff?

"A. Insufficient funds.

"Q. Is that the only reason that they gave in your notice?

"A. Yes."   3 id., at 1–83, 1–85.

[10] As respondent's counsel put it in responding to petitioner's motion for a directed verdict at the close of plaintiff's evidence:

"Plaintiff written reprimand contrary to thrust of the decision of the Civil Service Commission.   That's in evidence.   That's true.   Required plaintiff to make secondary employment reports that weren't required of others.   There's evidence to that effect.   Reduced his staff from nine to three.   There's evidence of that allegation.   Given plaintiff a low service rating on October 1st.   There's evidence of that.   Transferring him to a nonmanagement, nonsupervisory junior staff position.   There's evidence

puted that respondent's right to testify in support of his civil service appeal and his right to testify in opposition to the city's acquisition of the Serra sculpture were protected by the First Amendment to the Federal Constitution. Given the jury's verdict, the case is therefore one in which a municipal employee's federal constitutional rights were violated by officials of the city government. There is, however, a dispute over the identity of the persons who were responsible for that violation. At trial, respondent relied on alternative theories: Either his immediate superiors at CDA (who were named as individual defendants) should be held accountable, or, if the decisions were made at a higher level of government, the city should be held responsible.

The record contains a good deal of evidence of participation in the constitutional tort by respondent's superiors at CDA, by those directly under the Mayor, and perhaps by the Mayor himself.[11] Moreover, in closing argument, defense counsel

---

to that. Failure to establish goals against which he could be measured. All of these things. Finally, we say laying plaintiff off from a position on December 30th for the pretextual reason of lack of funds and a furtherance of the conspiracy to remove plaintiff from the Civil Service Commission. There's evidence of that, that he was laid off, that the reason was pretextual." 5 id., at 3-26—3-27.

[11] "Q. [Mr. Oldham] [T]here had to be a change in [HUD's] budget in order for you to be brought on board; is that correct?

"A. [Mr. Praprotnik] Yes.

"Q. Now, in order to get a change of budget, who had to be involved in that?

"A. That would involve the Board of Estimate and Apportionment, including the Mayor, the president of the Board of Aldermen, and the budget director—I'm sorry, the comptroller.

"Q. The comptroller. Those three people?

"A. Yes.

"Q. They're all high officials of the City.

"A. That's correct." 3 id., at 1-74—1-75.

"Q. [Ms. Ronzio] [A]fter you got transferred to Heritage and Urban Design in April or May of '82, are you claiming that Frank Hamsher did anything to injure or damage you thereafter once you were transferred out from under his supervision?

attempted to exonerate the three individual defendants by referring to the actions of higher officials who were not named as defendants.[12]

---

"A. [Mr. Praprotnik]   Yes, I am.

"Q. All right.   What would that be?

"A. That would be the control through the mayor's office of the budget situation within the Community Development Agency and the recommendations of the staffing and the funding coming to the Heritage and Urban Design Commission.

"Q. All right.   Do you know what Mr. Hamsher's position was after you were transferred to Heritage?   Did he remain director of CDA?

"A. He was director of CDA, yes, for a period of time after that.

"Q. For how long?   Do you know?

"A. He had implemented the layoff [of various CDA personnel at the time respondent was transferred to HUD].

"Q. For how long?   He implemented the layoff; that would have been in May.   How long thereafter did he continue as director?

"A. I don't know when he was switched to the mayor's office.

"Q. Then he went to the mayor's office as an assistant; right?

"A. That's correct.

"Q. As an executive aide.

"You are claiming that from the mayor's office he controlled Heritage Department's budget?

"A. Yes.

"Q. And how did that affect you?

"A. It affected me by I was laid off for lack of funds to that agency.

"Q. So how did Mr. Hamsher do that?

"A. By control through the Community Development Agency and recommendations that could be made to its, you know, director at this time.

"Q. He was not director of Community Development Agency.   Are you still maintaining that he controlled their budget?

"A. I'm saying that he influenced their budget.   The mayor's office played a very strong control within the influence of various City departments.

.          .          .          .          .

"Q. [W]hat are you claiming, if anything, that Mr. Kindleberger did to damage you after you were out from under his supervision?

"A. He had influenced the direction of the demise of duties, all the way up to that time, with the planner options that he had made available to Mr. Hamsher.

"Q. I'm asking after you transferred.

160

Thus, we have a case in which, after a full trial, a jury reasonably concluded that top officials in a city's administration, possibly including the Mayor, acting under color of

"A. After the transfer? Yes, he could still play a strong role because he was retained within the mayor's group and made recommendations to the Board of E&A that could have influenced the funding of our agency, the Heritage and Urban Design Commission.

"Q. You're using the word 'could.' Do you know for a fact that he did any of these things?

"A. Well, the budget had to go through the Community Development Agency, the approval. I'm saying he could have had that influence.

"Q. All right. So you don't know for a fact that he did do anything?

"A. I would say it was very likely that he would have had that influence."

"Q. [H]ow about Deborah Patterson [Director, CDA], who is also a defendant? Now, she never supervised you at all; is that correct? You were never under her supervision?

"A. She did not, that's correct.

"Q. She became director of CDA after you had already left the agency?

"A. That is correct.

"Q. What, if anything, are you claiming that she did to damage you, to injure you?

"A. There were meetings between my immediate supervisors at Heritage and Urban Design Commission and Deborah Patterson and CDA officials. So that influenced the budget going through and having to be approved by the Community Development Agency and also going through the mayor's office and the Board of E&A." 4 *id.*, at 2–75—2–77, 2–81—2–82.

"Q. [Ms. Ronzio] [W]hy do you think [Mr. Praprotnik] wasn't being treated fairly?

"A. [Mr. Zelsman, architect colleague of respondent at CDA] In my opinion, it was someone above him who did not want him in that position." 4 *id.*, at 2–97—2–98.

[From deposition; read at trial] "Q. [Mr. Oldham] Were there meetings in the mayor's office which involved you and his advisors and the mayor concerning the function and purpose of CDA?

"A. [Mr. Hamsher] I have had countless such meetings.

.  .  .  .  .

"Q. [Mr. Praprotnik] hadn't requested the transfer?

"A. No.

"Q. Had Mr. Jackson requested the transfer?

law, took retaliatory action against a gifted but freethinking municipal employee for exercising rights protected by the First Amendment to the Federal Constitution. The legal

"A. No.

"Q. It was done on your initiative then?

"A. It was done upon approval by the mayor of the transfer. It was done by me, Mr. Jackson, and Mr. Nash [City Director of the Department of Public Safety], all of whom assigned the appropriate paperwork to transfer Mr. Praprotnik.

"Q. Did Mr. Nash request the transfer?

"A. No, but he approved it.

"Q. So nobody from Heritage and Urban Design requested the transfer?

"A. That's correct.

"Q. And it was a decision that was made in the mayor's office and carried out by you; is that correct?

"A. It was a recommendation I made to the mayor, and the mayor concurred with it, and Mr. Nash and Mr. Jackson and myself carried it out." 4 id., at 2–174, 2–177—2–178.

[From deposition; read at trial] "Q. [Mr. Oldham] Who would have the authority to take functions out of one appointing authority and move them over to another appointing authority? Who would have that authority?

"A. [Mr. Duffe] Well, it depends on the situation. The Board of Estimate and Apportionment in some cases; in other cases it would be the mayor to the best of my knowledge." 4 id., at 2–180.

[From deposition; read at trial] "Q. [Mr. Oldham] Anybody else other than Mr. Hamsher, and yourself, and the mayor, who had the final decisions on these matters [transfer of functions between agencies]?

"A. [Mr. Edwards, City Executive Director of Development] Well, particularly I guess, the mayor had the final decision. As I recall the recommendations of Mr. Hamsher were adopted, you know, pretty generally. I don't remember any major divergence from his recommendation." 4 id., at 2–185—2–186.

"Q. [Ms. Ronzio] What do you do, Mr. Hamsher? What is your occupation?

"A. [Mr. Hamsher] I am the counsel for development in the mayor's office, City of Saint Louis.

.         .         .         .         .

[Discussion of CDA's 1982 layoffs] "Q. Did you voice your concerns to the mayor?

"A. Oh, yes.

"Q. What was his reaction to your concerns?

question is whether the city itself is liable for such conduct under § 1983.[13]

## II

In the trial court there was little, if any, dispute over the governing rules of law. In advance of trial, the city filed a

---

"A. He listened. He and I discussed it back and forth. And he was elected by the people so he made the decision.

"Q. He said 'Go ahead and lay off'?

"A. Yes." 5 *id.*, at 3–134, 3–167.

"Q. [Mr. Oldham] [Y]ou indicated that you work for the mayor; is that correct?

"A. [Mr. Hamsher] Yes.

"Q. And doesn't the mayor keep a pretty tight rein on operations within the City?

"A. Sure.

.          .          .          .          .

"Q. Isn't it fair to say, Mr. Hamsher, that you initiated the [transfer], that you had sort of recommended it through the mayor's office, sort of pushed to get it done?

"A. I wouldn't say I pushed to get it done. I recommended it to the mayor. The mayor made a decision. And when the mayor makes a decision, all of us who work for him try to carry it out." 5 *id.*, at 3–184–3–185, 3–200.

[12] "Now, another thing I would seriously like you to consider is, who is not a defendant in this matter. Who is not a defendant? Donald Spaid is not a defendant. Donald Spaid is the guy who laid that first suspension on or who was the one—not laid the suspension on, but set up that secondary employment policy. He is the man who allegedly, according to Mr. Praprotnik, got so angry that he would go to any lengths to retaliate, directed his subordinates to retaliate.

"Don Spaid is not a defendant in this case. Okay?

"Who laid Jim Praprotnik off? Who really laid him off? Who signed off on the form? Rob Killen signed the form. At the time Mr. Praprotnik was at Heritage and Urban Design and got laid off, Rob Killen was his appointing authority. It was his decision. He's the one who prepared that budget that went to Deborah Patterson.

"Who else is not a defendant? Rob Killen's boss, Tom Nash. Tom Nash allegedly approved it and went along with Rob Killen. Do you see him here? Nope. *Let's hang it on these guys.*" 6 *id.*, at 4–50—4–51 (emphasis added).

[13] The concurrence disapproves of any reliance on evidence regarding the reaction of various high officials to respondent's Serra sculpture testimony

motion for summary judgment that the District Court ultimately denied because the record contained an affidavit stating that respondent "was transferred due to 'connivance' of the mayor, the mayor's chief of staff, and the city's personnel director." 1 Record 130. No one appears to have questioned the proposition that if such facts could be proved at trial, the city could be held liable.[14]

---

on the ground that "the jury instructions concerning respondent's First Amendment claim refer exclusively to the exercise of his appellate rights before the CSC and make no mention whatever of his public testimony." *Ante*, at 142, n. 5. Two points should suffice in response. First, the instruction in question told the jury that it "must" find for respondent if it found certain facts relating to the CSC appeals, but did not preclude the jury from finding for respondent on other grounds as well. Second, as the concurrence itself recognizes, see *ante*, at 135, a separate instruction, which I quote below in the text at n. 15, told the jury it could hold the city liable for actions committed by high enough officials. This instruction did not limit the field of high officials' actions that could give rise to municipal liability.

The concurrence also states that the record fails to provide "sufficient evidence of complicity on the part of other municipal policymakers such that we may sustain the jury's verdict against petitioner on a conspiracy theory neither espoused nor addressed by the court below." *Ante*, at 142, n. 5. But we are reviewing the Court of Appeals' *judgment*, not its *opinion*, and however flawed the latter, the former must be sustained if sufficient evidence exists to support, under a proper view of municipal liability, the verdict actually rendered. Moreover, as I discuss in greater detail in Part II, the jury was given wide rein to examine the conduct of the city's officials and to conclude whether or not high officials retaliated against respondent's exercise of his constitutional right to freedom of speech. The lengthy quotations from the record make it clear that sufficient evidence *was* introduced to support the jury's verdict.

[14] Petitioner points to the following argument made in support of its motion for summary judgment:

"In the instant case, Plaintiff has failed to even allege the existence of any such [municipal] policy. In fact, Plaintiff refers to City 'policy' only in one instance in his complaint—at paragraph 29(c), wherein he claims the City's layoff policy . . . was *not* followed. In the absence of allegations of impermissible policy, or of facts indicative that such policy exists, the City, itself, may not be held liable." Memorandum in Support of Motion for Summary

After respondent's evidence had been presented at trial, the city made a motion for a directed verdict, again advancing the argument that there was insufficient evidence in the record to support a judgment against the city. The argument on that motion does not indicate that the parties had any dispute about the applicable rules of law. For counsel for the city argued:

"I understand that you can be liable—a municipality can be held liable if its high ranking officials are allowed to violate someone's constitutional rights. I fail to see how you can find any evidence that the City of St. Louis did that." 5 *id.*, at 3–28.

The jury obviously disagreed with this assessment of the evidence. Moreover, the judge denied that motion, initially and at the close of all evidence, as well as the city's motion for a judgment notwithstanding the verdict.

Finally, the ultimate instruction to the jury on the issue of municipal liability was in fact proposed by the city's attorney, as the plurality acknowledges, *ante*, at 119; see Brief for Respondent 48; Reply Brief for Petitioner 6:

"As a general principle, a municipality is not liable under 42 U. S. C. § 1983 for the actions of its employees. However, a municipality may be held liable under 42 U. S. C. § 1983 if the allegedly unconstitutional act was

---

Judgment or, in the Alternative, for Judgment on the Pleadings 16, Reply Brief for Petitioner 5 (emphasis in original).

This argument, like all of petitioner's contentions in the trial court on the subject of municipal liability, was addressed to the sufficiency of respondent's factual support for binding the city, not to any legal issue regarding who could and who could not bind the city. The District Court, indeed, initially granted summary judgment for the city on the ground that "the Court is unable to discern any suggestion that defendants' allegedly wrongful actions were in accordance with city policy." 1 Record 126. But after receiving respondent's motion for reconsideration, accompanied by his affidavit, discussed in the text, *supra*, the District Court reversed itself and denied the city's motion.

committed by an official high enough in the government so that his or her actions can be said to represent a government decision." Instruction No. 15, App. 113.[15]

In my opinion it is far too late for the city to contend that the jury instructions on municipal liability were insufficient or erroneous.[16] In *Oklahoma City* v. *Tuttle*, 471 U. S. 808 (1985), we permitted an objection to an instruction by defendant for the first time on appeal only because plaintiff failed to raise the contemporaneous-objection argument until its brief on the merits in this Court. We stated that such arguments "should be brought to our attention *no later* than in respondent's brief in opposition to the petition for certiorari." *Id.*, at 816 (emphasis in original). In this case, respondent properly pointed out in his response to the petition for a writ of

---

[15] Proposing this instruction made good sense as litigation strategy, for respondent had sued not only the city but also three individual city officials, Frank Hamsher, Charles Kindleberger, and Deborah Patterson. Presumably the city's attorney, who was representing both the city and the officials, hoped that the jury would focus on the individual defendants, exonerate them, and, having focused on these defendants, hold the city innocent as well by concluding that higher-ups were not implicated. As we know from the verdict—judgment for the individual defendants but against the city—this strategy partially failed. Although petitioner argues that the verdicts were inconsistent, they actually make perfect sense in light of the evidence that officials in the Mayor's office, possibly including the Mayor himself, and various agency heads participated in a deliberate plan to deprive respondent of his job in violation of his First Amendment rights.

[16] Federal Rule of Civil Procedure 51 is quite clear about a litigant's method of preserving objections to instructions:

"At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury. The court, at its election, may instruct the jury before or after argument, or both. *No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict,* stating distinctly the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury." (Emphasis added.)

certiorari that petitioner had failed to object to the relevant jury instruction. Brief in Opposition 10–11.[17]

Apparently acknowledging that this case cannot be decided on the basis of any possible error in any of the jury instructions, the plurality views petitioner's motions for summary judgment and a directed verdict as raising and preserving a legal question concerning the standard for determining municipal liability. *Ante,* at 120. But these motions did not raise any legal issue that was disputed. It is most unfair to permit a defeated litigant in a civil case tried to a verdict before a jury to advance legal arguments that were not made in the District Court, especially when that litigant *agrees,* both in its motions and proposed instructions, with its opponent's view of the law.[18] Although, as the plurality points out, the

---

[17] In the Court of Appeals the city had argued that the trial court should have accepted the following instruction regarding municipal liability:

"An isolated incident of illegal conduct on the part of a municipality's agents, servants or employees is not sufficient to establish a governmental custom, usage or official policy such as would give rise to liability on the part of a municipality pursuant to 42 U. S. C. § 1983." Instruction No. A, App. 127.

The Court of Appeals properly upheld the trial court's rejection of this instruction, see *Pembaur* v. *Cincinnati,* 475 U. S. 469 (1986), and petitioner does not take issue with this holding.

[18] The plurality states that petitioner's motions, although "much less detailed than the arguments it now makes in response to the decision of the Court of Appeals," nonetheless properly "preserve[d] the issue raised in its petition for certiorari." *Ante,* at 120. But petitioner made no arguments in these motions, much less sparsely detailed ones, on behalf of *any* legal standard for municipal liability. The plurality does not overcome the fact that petitioner's motions were made on the basis of evidentiary insufficiency. Finally, even if the mere making of motions for summary judgment, directed verdict, and judgment notwithstanding the verdict could preserve any legal issue that might arise in a case—a proposition we should be slow to accept—such preservation should quickly spoil when the moving party *admits,* in both an offered instruction and an argument on behalf of one of the motions, that the law is as its opponent would have it. As I have shown above, petitioner did just that in offering Instruction No. 15 and in arguing in support of a directed verdict.

question presented in the certiorari petition "was manifestly framed in light of the holding of the Court of Appeals," *ante*, at 119, the legal issue of municipal liability had never been raised in the District Court.

Given the procedural history, it is not only unfair to respondent, but also poor judicial practice, to use this case as a bulldozer to reshape "a legal landscape whose contours are 'in a state of evolving definition and uncertainty.'" *Ante*, at 120 (plurality opinion) (citation omitted). It would be far wiser in the long run simply to resolve the issues that have been properly framed by the litigants and preserved for review. Nevertheless, in view of the fact that the Court has "set out again to clarify the issue that we last addressed in *Pembaur*," *ante*, at 124 (plurality opinion), it is appropriate to explain my view of how our precedents in this area apply to this case.

## III

In *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), we held that municipal corporations are "persons" within the meaning of 42 U. S. C. § 1983. Since a corporation is incapable of doing anything except through the agency of human beings, that holding necessarily gave rise to the question of what human activity undertaken by agents of the corporation may create municipal liability in § 1983 litigation.[19]

The first case dealing with this question was, of course, *Monell*, in which female employees of the Department of So-

---

[19] The "theme" of *Monell*—"that some basis for government liability other than vicarious liability for the acts of individuals must be found"—has proved to be a "difficult" one largely because "there is no obvious way to distinguish the acts of a municipality from the acts of the individuals whom it employs." Whitman, *supra* n. 1, at 236. In other words, every time a municipality is held liable in tort, even in a case like *Monell*, actions of its human agents are necessarily involved. Accordingly, our task is not to draw a line between the actions of the city and the actions of its employees, but rather to develop a principle for determining *which* human acts should bind a municipality.

cial Services and the Board of Education of New York City challenged the constitutionality of a citywide policy concerning pregnancy leave. Once it was decided that the city was a "person," it obviously followed that the city had to assume responsibility for that policy. Even if some departments had followed a lawful policy, I have no doubt that the city would nevertheless have been responsible for the decisions made by either of the two major departments that were directly involved in the litigation.

In *Owen* v. *City of Independence*, 445 U. S. 622 (1980), the Court held that municipalities are not entitled to qualified immunity based on the good faith of their officials. As a premise to this decision, we agreed with the Court of Appeals that the city "was responsible for the deprivation of petitioner's constitutional rights." *Id.*, at 633; see also *id.*, at 655, n. 39. Petitioner had been fired as City Chief of Police without a notice of reasons and without a hearing, after the City Council and the City Manager had publicly reprimanded him for his administration of the Police Department property room. This isolated personnel action was clearly *not* taken pursuant to a rule of general applicability; nonetheless, we had no problem with the Court of Appeals' conclusion that the action of the City Council and City Manager was binding on the city.[20]

---

[20] Since *Owen*, Members of the Court have offered varying explanations for that conclusion: "[T]he release of the information was an official action—that is, a policy or custom—of the city," *Oklahoma City* v. *Tuttle*, 471 U. S., at 832 (BRENNAN, J., concurring in the judgment); "[A] municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy," *Pembaur* v. *Cincinnati*, 475 U. S., at 480 (BRENNAN, J.); "Formal procedures that involve, for example, voting by elected officials, prepared reports, extended deliberation, or official records indicate that the resulting decisions taken 'may fairly be said to represent official policy.'" *Id.*, at 500 (Powell, J., dissenting). Today, the plurality offers an explanation for *Owen* similar to that offered by Justice Powell in his

In the next municipal liability case, the Court held that an isolated unconstitutional seizure by a sole police officer did not bind the municipality. *Oklahoma City* v. *Tuttle*, 471 U. S. 808 (1985).[21] Thus, that holding rejected the common-law doctrine of *respondeat superior* as the standard for measuring municipal liability under § 1983. It did not, of course, reject the possibility that liability might be predicated on the conduct of management level personnel with policymaking authority.

Finally, in *Pembaur* v. *Cincinnati*, 475 U. S., at 471, we definitively held that a "decision by municipal policymakers on a single occasion" was sufficient to support an award of damages against the municipality. In *Pembaur*, a County Prosecutor had advised County Sheriffs at the doorstep of a recalcitrant doctor to "go in and get [the witnesses]" to alleged charges of fraud by the doctor. *Id.*, at 473. Because the Sheriffs possessed only arrest warrants for the witnesses and not a search warrant for the doctor's office as well, the

---

*Pembaur* dissent: "We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Ante*, at 123. For its part, the concurrence's explanation of *Owen* resembles that offered by JUSTICE BRENNAN in *Pembaur*: "Nor have we ever doubted that a single decision of a city's properly constituted legislative body is a municipal act capable of subjecting the city to liability." *Ante*, at 138; see also *ante*, at 139, n. 3. But neither opinion explains *why* a single personnel decision by a legislature ought bind a municipality any differently than any other duly authorized personnel decision.

[21] Although no one opinion commanded a majority of the Court, the narrowest reason for the holding was stated by JUSTICE BRENNAN. The jury had been instructed that it could infer *from the seizure alone* that the city had an unconstitutional policy of inadequate police training. Such an inference, according to JUSTICE BRENNAN, would be little more than *respondeat superior* in disguise. Whether independent proof of inadequate police training could result in municipal liability was a question that would have to wait for another day. See *Springfield* v. *Kibbe*, 480 U. S. 257 (1987) (dismissing as improvidently granted a writ of certiorari in a case raising this issue). Central to the holding in *Tuttle* was the fact that no high official was found to have been involved in the unconstitutional act.

advice was unconstitutional, see *Steagald* v. *United States*, 451 U. S. 204 (1981), and the question was whether the County Prosecutor's isolated act could subject the county to damages under § 1983 in a suit by the doctor. In the part of his opinion that commanded a majority of the Court, JUSTICE BRENNAN wrote:

> "[A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur* v. *Cincinnati*, 475 U. S., at 481 (footnote omitted).

Since the County Prosecutor was authorized to establish law enforcement policy, his decision in that area could be attributed to the county for purposes of § 1983 liability. As Justice Powell correctly pointed out in his dissent, "the Court . . . focus[ed] almost exclusively on the status of the decisionmaker." *Id.*, at 498.

Thus, the Court has permitted a municipality to be held liable for the unconstitutional actions of its agents when those agents enforced a rule of general applicability *(Monell)*; were of sufficiently high stature and acted through a formal process *(Owen)*; or were authorized to establish policy in the particular area of city government in which the tort was committed *(Pembaur)*. Under these precedents, the city of St. Louis should be held liable in this case.

Both *Pembaur* and the plurality and concurring opinions today acknowledge that a high official who has ultimate control over a certain area of city government can bind the city

through his unconstitutional actions even though those actions are not in the form of formal rules or regulations. See *Pembaur* v. *Cincinnati, supra,* at 479–481; *ante,* at 123 (plurality), at 139–140 (concurrence). Although the Court has explained its holdings by reference to the nonstatutory term "policy," it plainly has not embraced the standard understanding of that word as covering a rule of general applicability. Instead it has used that term to include isolated acts not intended to be binding over a class of situations. But when one remembers that the real question in cases such as this is not "what constitutes city policy?" but rather "when should a city be liable for the acts of its agents?", the inclusion of single acts by high officials makes sense, for those acts bind a municipality in a way that the misdeeds of low officials do not.

Every act of a high official constitutes a kind of "statement" about how similar decisions will be carried out; the assumption is that the same decision would have been made, and would again be made, across a class of cases. Lower officials do not control others in the same way. Since their actions do not dictate the responses of various subordinates, those actions lack the potential of controlling governmental decisionmaking; they are not perceived as the actions of the city itself. If a county police officer had broken down Dr. Pembaur's door on the officer's own initiative, this would have been seen as the action of an overanxious officer, and would not have sent a message to other officers that similar actions would be countenanced. One reason for this is that the County Prosecutor himself could step forward and say "that was wrong"; when the County Prosecutor authorized the action himself, only a self-correction would accomplish the same task, and until such time his action would have countywide ramifications. Here, the Mayor, those working for him, and the agency heads are high-ranking officials; accordingly, we must assume that their actions have citywide ramifications, both through their similar response to a like

class of situations, and through the response of subordinates who follow their lead.[22]

Just as the actions of high-ranking and low-ranking municipal employees differ in nature, so do constitutional torts differ. An illegal search *(Pembaur)* or seizure *(Tuttle)* is quite different from a firing without due process *(Owen);* the retaliatory personnel action involved in today's case is in still another category. One thing that the torts in *Pembaur*, *Tuttle*, and *Owen* had in common is that they occurred "in the open"; in each of those cases, the ultimate judgment of unconstitutionality was based on whether undisputed events (the breaking-in in *Pembaur*, the shooting in *Tuttle*, the firing in *Owen*) comported with accepted constitutional norms. But

---

[22] That high officials may bind a municipality in ways that low officials may not should not surprise, for the pyramidal structure of authority pervades the law. For instance, the law of agency distinguishes between a general agent and a special agent; the former is "authorized to conduct a series of transactions involving a continuity of service," while the latter is "authorized to conduct a single transaction or a series of transactions not involving continuity of service." Restatement (Second) of Agency §§ 3(1), (2) (1958). The distinction matters because only a general agent "subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized." *Id.*, § 161. A special agent, to the contrary, "has no power to bind his principal by contracts or conveyances which he is not authorized or apparently authorized to make," with some exceptions. *Id.*, § 161A. A general agent thus binds his principal even through unauthorized acts precisely because those dealing with him perceive him as possessing broad authority to act on behalf of his principal. A special agent, possessing and known to possess only limited authority, cannot bind his principal for unauthorized acts because those dealing with him are on notice that his authority extends only so far. Likewise, a high municipal official can bind his principal (the city) for unauthorized actions because others—both lower officials and members of the public with whom he deals—perceive him as acting with broad authority and rely upon his actions in organizing their own behavior. The distinction between general agents and special agents has a firm "basis in the law." See *ante*, at 125, n. 2 (plurality opinion).

the typical retaliatory personnel action claim pits one story against another; although everyone admits that the transfer and discharge of respondent occurred, there is sharp, and ultimately central, dispute over the reasons—the motivation— behind the actions. *The very nature of the tort is to avoid a formal process.* *Owen*'s relevance should thus be clear. For if the Court is willing to recognize the existence of municipal policy in a nonrule case as long as high enough officials engaged in a formal enough process, it should not deny the existence of such a policy merely because those same officials act "underground," as it were. It would be a truly remarkable doctrine for this Court to recognize municipal liability in an employee discharge case when high officials are foolish enough to act through a "formal process," but not when similarly high officials attempt to avoid liability by acting on the pretext of budgetary concerns, which is what this jury found based on the evidence presented at trial.

Thus, holding St. Louis liable in this case is supported by both *Pembaur* and *Owen.* We hold a municipality liable for the decisions of its high officials in large part because those decisions, by definition, would be applied across a class of cases. Just as we assume in *Pembaur* that the County Prosecutor (or his subordinates) would issue the same breakdown-the-door order in similar cases, and just as we assume in *Owen* that the City Council (or those following its lead) would fire an employee without notice of reasons or opportunity to be heard in similar cases, so too must we assume that whistleblowers like respondent would be dealt with in similar retaliatory fashion if they offend the Mayor, his staff, and relevant agency heads, or if they offend those lower ranking officials who follow the example of their superiors. Furthermore, just as we hold a municipality liable for discharging an employee without due process when its city council acts formally—for a due process violation is precisely the *type* of constitutional tort that a city council might commit when it acts formally—so too must we hold a municipality liable for discharging an employee in retaliation against his public speech

when similarly high officials act informally—for a First Amendment retaliation tort is precisely the *type* of constitutional tort that high officials might commit when they act in concert and informally.

Whatever difficulties the Court may have with binding municipalities on the basis of the unconstitutional conduct of individuals, it should have no such difficulties binding a city when many of its high officials—including officials directly under the Mayor, agency heads, and possibly the Mayor himself—cooperate to retaliate against a whistleblower for the exercise of his First Amendment rights.[23]

I would affirm the judgment of the Court of Appeals.

---

[23] The plurality incorrectly claims that I have suggested "a new theory" for determining when a municipality should be bound by the acts of its agents. *Ante*, at 125, n. 2. As both the plurality and the concurrence recognize, a municipality, like any institution, can only act through the agency of human beings. By holding that isolated actions of high officials may give rise to municipal liability, see, *e. g.*, *Owen* v. *City of Independence; Pembaur* v. *Cincinnati*, the Court has indicated that the mere status of city officials matters in determining whether the city may be held liable for the officials' actions. The argument of both the plurality and the concurrence that this principle should be applied only in the particular area of government that the erring official controls is unpersuasive, given the multifarious ways in which governmental agents may inflict constitutional harm. This case is a perfect example of why the "area-by-area" approach will not do; personnel actions may be taken in response to an employee's protected speech by a number of high officials, none of whom possesses specific authority over "personnel" policy. Nevertheless, simply by virtue of their high rank, their actions may influence the actions of other municipal officials. It is that kind of influence that provides the common thread binding *Monell* and the later § 1983 municipal liability cases. In short, what the Court has characterized as "a new theory" is actually a way of understanding our precedents that will permit a judge to explain to a jury that "policy" means nothing if not "influence," and that while the isolated gunshot of an errant police officer would not influence his colleagues, see *Oklahoma City* v. *Tuttle*, adverse personnel actions taken by a city's highest officials in response to an employee's Civil Service Commission appeals and his public testimony would set an example for other, lower officials to follow.