UNPUBLISHED

# UNITED STATES COURT OF APPEALS

### FOR THE FOURTH CIRCUIT

UNITED STATES COLD STORAGE,
INCORPORATED,

$\left.\begin{array}{l} \\ \\ \textit{Plaintiff-Appellant,} \\ \\ \text{v.} \\ \\ \\ \textit{Defendant-Appellee.} \end{array}\right\}$

CITY OF LUMBERTON,

No. 01-2197

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(CA-00-18-7-F(1))

Argued: April 4, 2002

Decided: May 2, 2002

Before MICHAEL and MOTZ, Circuit Judges, and
Walter K. STAPLETON, Senior Circuit Judge of the
United States Court of Appeals for the Third Circuit,
sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Robert Edward Hornik, Jr., THE BROUGH LAW FIRM,
Chapel Hill, North Carolina, for Appellant. Charles Floyd McDarris,
HOLT, YORK, MCDARRIS, L.L.P., Raleigh, North Carolina; Albert
Mansell Benshoff, Lumberton City Attorney, Lumberton, North Caro-
lina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

United States Cold Storage, Incorporated brought this 42 U.S.C.A. § 1983 (1994) action, alleging violation of First Amendment rights, and a pendent state law breach of contract claim, against the City of Lumberton. The district court granted summary judgment to the City; we affirm.

### I.

Cold Storage, which leases refrigerated space for food storage, opened a new facility just outside the City's corporate limits in 1987. Cold Storage and the City signed a written contract, dated June 8, 1987, under which the City agreed to extend its water and sewer lines to the facility, and to provide water and sewer services. In return, Cold Storage agreed to pay the City "the applicable rate . . . as required by the Code of the City of Lumberton." The relevant code provision, Lumberton City Ordinance § 23-6, provides that "[t]he monthly charge for city sewer service shall be based upon the water usage of the customer." Specifically, the volume of water received, measured in gallons, is multiplied by a rate per gallon, also stated in § 23-6, to generate the sewer service charge. The parties refer to this billing method as "water in/sewer out"; it is commonly used by municipalities because water inflow is easy to measure and in most cases provides a good approximation of discharge into a sewer system (water piped into a facility for use normally returns for treatment).

Over the next eight years, the City provided water and sewer services but failed to bill Cold Storage for sewer. (It appears that the City's finance department was in almost complete disarray.) When the City discovered its error, in September 1995, it sent Cold Storage a bill for sewer services based on the water in/sewer out method. Although Cold Storage conceded an obligation to pay for sewer ser-

vices, it objected to use of the water in/sewer out method. About 85 percent of the water received by Cold Storage's Lumberton facility is sent into cooling towers, where it evaporates rather than returning to the City for treatment. Cold Storage therefore believed that its facility burdened the City's treatment plant far less than the volume of water inflow would suggest.

Cold Storage presented this argument to the Public Works Director, who proved receptive. The Director conferred with the City Manager, and then instructed Cold Storage to begin measuring the flow of water into its towers. Thereafter, the Director told Cold Storage, it would be charged the per-gallon rate for treatment only on water not sent into the towers. And, in fact, Cold Storage has proffered undisputed evidence that the City's finance department used this method to calculate Cold Storage's bills for just over three years.

In July 1999, however, the City discontinued this novel billing method and issued Cold Storage a bill based on the water in/sewer out method, resulting in a charge more than ten times higher than Cold Storage's two previous bills. When Cold Storage protested, the City informed it that water in/sewer out was the proper billing method under the 1987 contract, that the City would use this method to prepare all future bills, and that the City would shortly bill Cold Storage for undercharges over the past three years.

The parties differ sharply as to why the billing method changed. The City asserts that in mid-1999 it was beginning to improve financial controls after years of mismanagement. It had hired a new City Manager, who installed new billing software in May 1999 and discovered a large number of billing irregularities. The City insists that its billing policy has been evenhanded, and that Cold Storage is only one of many companies whose bills either have been or soon will be brought into line with written City policy.

Cold Storage contends, to the contrary, that many City customers continue to benefit from billing arrangements that deviate from written policies, and that the City has punished it for opposing a recent annexation ordinance. The City announced plans to annex land just outside its limits late in 1998, including the land on which Cold Storage's Lumberton facility is located. Cold Storage opposed the City's

plans at a public meeting in December 1998, and then, after the City Council adopted an annexation ordinance in March 1999, challenged the ordinance in state court. Cold Storage asserts that the City has retaliated against it for pursuing this suit by the change in billing methods, surprise meter inspections, threats to cut off Cold Storage's water during a good faith dispute about the billing method, sewer certificate inspections, inquiries into Cold Storage's use of its industrial well, and critical press releases from the City Manager's office misstating Cold Storage's position on the annexation issue.

II.

On February 4, 2000, Cold Storage filed this action, naming the City as the sole defendant. In its complaint, Cold Storage alleges that the City, by the acts set forth above, retaliated against Cold Storage for its exercise of First Amendment rights, in violation of 42 U.S.C.A. § 1983 and breached the 1987 contract, as modified in 1995, by billing according to the water in/sewer out method. (Cold Storage also brought a third claim, alleging that the City threatened to breach a contract to provide fire protective services. After discovery, however, Cold Storage agreed to dismiss this claim, and it is not before us.) The City filed a counterclaim, in which it asked the court to "require [Cold Storage] to pay all unpaid water and sewage amounts that are past due and owing to the City of Lumberton."

At the close of discovery the district court granted summary judgment to the City on all claims. With respect to the retaliation claim, the district court assumed, without deciding, that the City could be held liable for the actions of its City Manager, but held that Cold Storage had not proffered sufficient evidence of retaliatory acts by the City to create a material issue of fact. On the contract claim, the court held that the 1995 modification would be valid only if supported by consideration, and that Cold Storage had offered no evidence of consideration. The district court then declined to exercise jurisdiction over the City's counterclaim, which it dismissed without prejudice.

Only Cold Storage appeals. We consider each of its claims in turn.

III.

Even assuming that the acts Cold Storage cites were retaliatory in nature, the company's retaliation claim cannot succeed because these

acts cannot be attributed to the City. A municipality is liable only for injuries arising from a municipal "policy or custom." *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). Municipal policy may be expressed in legislative acts, like an ordinance or regulation; in a single action taken by a municipal official with "final policymaking authority" in the relevant area; or even by the actions of a subordinate official that a higher official ratifies. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

The decisive question in any case is whether the acts that cause injury constitute acts "'of the municipality' — that is, acts which the municipality has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 479. By extension, practices not authorized by express policy may nonetheless constitute acts "of the municipality" if "persistent and widespread" and "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 691). *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (explaining that liability for municipal "custom" is intended to forestall "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies" which they have ratified sub silentio).

In this case, Cold Storage does not allege that it suffers from a City "custom" of retaliation against the exercise of First Amendment rights. Nor does it allege that the City's ordinances or written policies are themselves discriminatory. In fact, City Ordinance § 23-6 sets forth a uniform per-gallon rate for all sewer bills, and a uniform method of calculating the volume on which that rate is charged. What Cold Storage contends is that the City's written policy was not uniformly enforced, but *was* enforced against Cold Storage to procure its silence in the annexation dispute.

To succeed on this claim, Cold Storage must prove that the assertedly retaliatory acts were authorized by a decisionmaker with final policymaking authority, who intended to punish Cold Storage for its speech or was deliberately indifferent to that possibility. *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). In deciding which officials have final policymaking authority, two dis-

tinctions are of critical importance. First, the decisionmaker must be authorized to make "policy," i.e., to "set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987). Second, the decisionmaker's authority in the relevant policy area must be "final," i.e., not subject to further review within the municipality. *See Praprotnik*, 485 U.S. at 112.

Although the Supreme Court did not produce a majority opinion in *Praprotnik*, seven Justices did agree on principles with clear application to this case. Justice O'Connor, writing for four members of the Court, explained that "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127 (plurality opinion). Justice Brennan, writing for three Justices, similarly stated that:

> a municipality is not liable merely because the official who inflicted the constitutional injury had the final authority to act on its behalf; rather . . . the official in question must possess final authority to establish municipal policy with respect to the challenged action . . . . [I]f, in a given county, the Board of County Commissioners established county employment policy and delegated to the County Sheriff alone the discretion to hire and fire employees, the county itself would not be liable if the Sheriff exercised this authority in an unconstitutional manner, because the decision to act unlawfully would not be a decision of the board.

*Praprotnik*, 485 U.S. at 139-40 (Brennan, J., concurring). *See also Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 964-66 (4th Cir. 1995).

With these distinctions in mind, we consult "the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law," to determine which officials in the City of Lumberton had "final policymaking authority" over municipal sewer bills and inspections. *Jett*, 491 U.S. at 737. In North Carolina "[e]xcept as otherwise provided by law, the government and general

management of the city shall be vested in the [City] council." N.C.G.S. § 160A-67 (1999). Cold Storage points to no provision of North Carolina law that gives final policymaking authority over any matter to the City Manager, the Director of Public Works, or the Chief Inspector of the City. Nor does Cold Storage assert that the City Council of Lumberton delegated its authority over billing or inspection policy to these officials, or that the officials' actions were not subject to review by the Council. *Compare Gros v. Grand Prairie, Texas*, 181 F.3d 613, 616, n.2 (5th Cir. 1999). Thus, only the City Council had final policymaking authority over any actionable, allegedly retaliatory, act. *See Riddick v. School Bd. of the City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000) ("When a municipal official's discretionary action 'is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.'") (citation and quotation marks omitted).

The record, even when viewed in the best light for Cold Storage, does not permit an inference that the City Council authorized discrimination against Cold Storage or intended to punish the company for its political activities. Cold Storage has proffered no evidence to indicate that *the Council* ordered any of the meter or sewer inspections, either directly or indirectly, or that *the Council* otherwise singled out Cold Storage for adverse treatment. Consequently, even assuming that the City's express policy of nondiscrimination was unevenly enforced, we could hold the City liable only on a theory of respondeat superior, which controlling legal authority expressly prohibits. *See Monell*, 436 U.S. at 692-94.

IV.

Cold Storage also contends that the district court erred in holding that no consideration supported modification of its contract with the City in 1995. Before us, Cold Storage makes two arguments not presented to the district court. We will consider such arguments "only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993). There is no danger of plain error or injustice here.

First, Cold Storage contends that the City waived the defense of lack of consideration by failing to plead the defense in its answer as

required by Fed. R. Civ. P. 8(c). But Cold Storage can succeed on this contention only by showing that the City's failure was prejudicial. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999) ("[A]bsent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion.") (citations omitted). It cannot make such a showing. The City raised the lack of consideration defense in its motion for summary judgment, after which Cold Storage had almost a month to prepare its reply, and five additional months to prepare for oral argument. During that time, Cold Storage had ample opportunity to marshall evidence (and argue) that it provided consideration for the modification; for example, it could have presented affidavits attesting to negotiations with the City or internal financial records to document a payment. Instead, Cold Storage asserted that no consideration was needed to support modification because the Uniform Commercial Code governed its contract with the City, an argument properly rejected by the district court. Having failed in the district court to argue that consideration was present, or present evidence to that effect, Cold Storage is not entitled to a second bite at the apple.

For similar reasons, Cold Storage's second argument also fails. On appeal, Cold Storage contends that there is record evidence which, viewed in the best light for it, would support a finding that it provided consideration for the modification. Specifically, Cold Storage asserts that it could have drilled a well in 1995, and obtained water from that well instead of from the City. According to Cold Storage, the City knew that it had this opportunity, and agreed to modify the contract in exchange for Cold Storage's forbearance. But Cold Storage never made this argument to the district court. And, even on appeal, Cold Storage cannot point to evidence sufficient to create a triable issue of fact. The record contains no evidence, for example, that Cold Storage *told* the City it might drill a well, or that the City changed its billing practice as a direct response. Indeed, at oral argument, counsel for Cold Storage conceded that the sole evidence supporting modification was the behavior of the City after 1995.

V.

For these reasons, the judgment of the district court is

*AFFIRMED.*