OPINION OF THE COURT
STAPLETON, Circuit Judge:
Lynne A. Regan appeals from the District Court’s entry of summary judgment against her and in favor of defendants James Johnson and The GEO Group, Inc. (“GEO”). We wfll affirm.
I.
Regan was involved in a relationship with Donald Kuhfuss, a firefighter with the Upper Darby (Pennsylvania) Fire Department, and she resided with Kuhfuss. The relationship deteriorated, Regan moved out of Kuhfuss’s home, and Regan and Kuhfuss each obtained a protection from abuse (“PFA”) order against each other. Pursuant to the PFA order obtained by Regan, she was to have an opportunity to remove personal belongings from Kuh-fuss’s home under police supervision. Pursuant to the PFA order obtained by Kuhfuss, Regan was to have no contact with Kuhfuss or his mother, Jane Minster.
Thereafter, Regan filed a petition to have Kuhfuss involuntarily committed on grounds that he was suicidal, and police arrested Kuhfuss and transported him to Mercy Fitzgerald Hospital for observation. At this point, Kuhfuss phoned defendant Johnson, his friend and coworker at the Upper Darby Fire Department, to advise him of these circumstances, and Johnson met Kuhfuss at the hospital. While at the hospital and in front of Johnson, Kuhfuss suffered a stroke that left him partially paralyzed and unable to speak. Kuhfuss was admitted to the hospital.
While Kuhfuss was still in the hospital, Regan contacted the Upper Darby Police Department to make arrangements to pick up her personal belongings from Kuhfuss’s home. Regan parked her car in the driveway of the Kuhfuss residence, and Sergeant Michael Kehrle met her there. Re-gan handed her PFA order to Sergeant Kehrle, and Sergeant Kehrle entered the house. Minster, Kuhfuss’s mother, was in the house and was upset that Regan was on the property, and so Minster telephoned Ed Cubler, Chief of the Upper Darby Fire Department and Kuhfuss’s boss, and asked him to come to the house. Cubler then called Johnson, his deputy, and asked him to come to the house.
While Regan was still in the car parked in the driveway, Cubler, Johnson, Detective Thomas A. Johnson of the Upper Darby Police Department (Johnson’s brother), and several unknown firefighters arrived and entered the home. Johnson parked his car in the driveway behind Regan’s car, and on his way into the house, he yelled at Regan, “I hope you go to hell, you [expletive] bitch.” App. at 204-05.
After some time, Sergeant Kehrle emerged from the house and instructed Regan to leave. He told Regan that she would not be permitted to go inside and retrieve her belongings because Minster did not want her in the house. Instead of leaving, Regan argued with Sergeant Kehrle, telling him that she had a court order allowing her to access the home and retrieve her belongings. Thereafter, she remained in her locked car with the windows up and dialed 9-1-1 on her cell phone, seeking to have a police supervisor come to the house to allow her inside. At *920 this point, Regan was visibly upset, appeared frightened, and was having trouble breathing. Meanwhile, Sergeant Kehrie began banging on Regan’s car window, instructing her to open the door. Sergeant Kehrie then gave Regan two choices: (1) be arrested for violating the terms of the PFA order that was obtained by Kuhfuss; or (2) go to the hospital to be treated for her breathing problem. Kehrie summoned an ambulance, and Re-gan was taken to Mercy Fitzgerald Hospital.
Approximately a month and a half later, on Wednesday, December 22, 2004, based on reports from Kuhfuss’s hospital caretakers that Regan had repeatedly attempted to contact Kuhfuss, Regan was arrested and charged with: (1) violating the PFA order obtained by-Kuhfuss; and (2) stalking and harassment, in violation of 18 Pa. Cons.Stat. § 2709. Regan was arraigned at the Upper Darby District Court that evening, and bail was set at $10,000. Unable to post bail, Regan was transported to the Delaware County Prison, which is managed and run by defendant GEO.
The following morning, Thursday, December 28, 2004, Michael Regan, Regan’s brother, arrived at the Upper Darby District Court to post bail, received two copies of Regan’s release paperwork, and took the paperwork to the Delaware County Prison. Michael Regan arrived at the prison at approximately noon and handed one copy of the release paperwork to the front gate guard. Thereafter, every hour until 4:00 p.m., Michael Regan inquired as to the status of his sister’s release, and he was told on several occasions that she was being processed.
At approximately 4:15 p.m., Michael Re-gan was informed by a guard that Regan would not be released that day because the paperwork was lost. Michael Regan handed the guard the second copy of the paperwork, and the guard took the paperwork into the prison. Michael Regan then called the prison’s records department and spoke with someone named Frank Della-Sorda. As Michael Regan was speaking with DellaSorda, the guard reached Della-Sorda and handed him the second copy of the paperwork. DellaSorda looked at the paperwork and told Michael Regan that a number was missing from the paperwork and that his sister was not going to be released that day, because the missing number had to be addressed by the Upper Darby District Court, which would not reopen until after the Christmas holiday. Michael Regan attempted to contact the Upper Darby District Court on December 23 and 24, but he was unable to reach anyone.
The number on Regan’s commitment form did not match the number on her release form, and it is GEO’s policy to halt an inmate’s release when the numbers do not match. For case management purposes, criminal charges in Delaware County are each generally assigned an Offense Tracking Number (“OTN”), except that charges for violations of PFA orders are each assigned a Miscellaneous Docket (“MD”) number. In this case, the court clerk mistakenly assigned an OTN on the commitment form to Regan’s charge of violation of the PFA order while an MD number was listed on her release form, and so the numbers did not match. GEO’s expert opined (and this opinion was uncon-troverted) that GEO’s policy that inmates are not to be released if a discrepancy in their paperwork exists is consistent with both the American Correctional Association’s national standard and with “sound correctional practices.” App. at 478-79.
While GEO’s records supervisor testified that discrepancies between court and release paperwork had occurred regularly and had been a problem for “a long time,” *921 App. at 433, when such discrepancies arose, prison personnel would place calls to the court, and the discrepancies would be resolved fairly quickly. The records supervisor testified also that in a typical release situation, where no discrepancies exist, it takes an average of four to six hours from the time the prison receives the paperwork to release of the inmate.
Regan was released from the prison on Tuesday, December 28, 2004, when the Upper Darby District Court reopened after the holiday. The charges against Re-gan were dismissed in January 2005.
Regan filed this action in the United States District Court for the Eastern District of Pennsylvania against fourteen separate defendants. Relevant to this appeal, Regan alleged that Johnson committed state law assault and false imprisonment in connection with the events in Kuhfuss’s driveway.[1] Regan also brought the following claims against GEO regarding the delay in her release from prison: (1) one under 42 U.S.C. § 1983, alleging that GEO violated her constitutional rights; (2) one for state law negligence; and (3) one for state law false imprisonment. Following discovery, the District Court granted summary judgment on all of Regan’s claims. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291.
II.
A.
In Pennsylvania, “an assault may be described as an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery.” Cucinotti v. Ortmann, 399 Pa. 26, 159 A.2d 216, 217 (1960) (italics in original). “Words in themselves, no matter how threatening, do not constitute an assault; the actor must be in a position to carry out the threat immediately, and he must take some affirmative action to do so.” Id. In other words, “[threatening words alone are deemed insufficient in this jurisdiction to put a person in reasonable apprehension of physical injury or offensive touching.” Id. at 218.
The evidence viewed in a light most favorable to Regan shows only that Johnson screamed an insult at Regan in Kuhfuss’s driveway. Regan testified that Johnson simply stood in front of her car and yelled, “I hope you go to hell, you [expletive] bitch.” While Johnson did park his car behind Regan’s car in the driveway, there is no evidence that Johnson intended this act to put Regan in fear of an immediate battery. Regan herself testified that Johnson made no physical contact with her, and indeed did not even attempt to make physical contact with her. Regan’s own testimony establishes that Johnson committed no acts that would objectively place a reasonable person in fear of imminent harmful contact.
Regan’s reliance on Brillhart v. Sharp, No. 4:CV-07-1121, 2008 WL 2857713, 2008 U.S. Dist. LEXIS 55624 (M.D.Pa. Jul. 21, 2008), is misplaced. In Brillhart, the court concluded that a jury could reasonably find that an assault was committed when defendant persistently and repeatedly stared at plaintiff, winked at her, and stuck his tongue out whenever he would *922 see her, but that was because defendant had previously sexually assaulted plaintiff. Id. at *3-4, *6-7, 2008 U.S. Dist. LEXIS 55624 at *9-10, *18-21. The court ruled that while “[t]aken in isolation, each of Sharp’s actions likely would not constitute assault,” “[w]hen considered in their totality and in the context of Sharp’s sexual assault of Brillhart ... the Court cannot conclude as a matter of law that no reasonable jury would find that Sharp’s actions caused Brillhart to reasonably apprehend a battery.” Id. at *7, 2008 U.S. Dist. LEXIS 55624 at *19. In this case, there is no evidence that Johnson ever physically attacked Regan, and Johnson’s conduct that is the basis for Regan’s claim was an isolated incident. Brillhart is inapposite, and the District Court did not err when it granted summary judgment on Regan’s assault claim against Johnson.
B.
“The elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention.” Renk v. City of Pittsburgh, 537 Pa. 68, 641 A.2d 289, 293 (1994). “In addition to unlawful activity, Pennsylvania law requires (1) acts intending to confine another within boundaries fixed by another which (2) directly or indirectly result in such confinement (3) of which the plaintiff is conscious or by which the plaintiff is harmed.” Chicarelli v. Plymouth Garden Apartments, 551 F.Supp. 532, 540-41 (E.D.Pa.1982) (citing Gagliardi v. Lynn, 446 Pa. 144, 285 A.2d 109, 111 n. 2 (1971); Restatement (Second) of Torts § 35). “Additionally, Plaintiff must make some request to leave, which request is denied by the defendant.” Pennoyer v. Marriott Hotel Servs., Inc., 324 F.Supp.2d 614, 620 (E.D.Pa.2004) (citing Chicarelli, 551 F.Supp. at 541).
Regan contends that she felt that she could not leave the situation in Kuh-fuss’s driveway, and that in the face of all the police activity, she reasonably believed she had no alternative to escape with Johnson’s car blocking her exit. However, the “fact that a plaintiff merely believes she is not free to leave is not enough to support a claim of false imprisonment.” Caswell v. BJ’s Wholesale Co., 5 F.Supp.2d 312, 319 (E.D.Pa.1998). There is no evidence that Regan made a request to leave that was denied. In fact, when Sergeant Kehrle asked Regan to leave, Regan argued with Sergeant Kehrle and then remained in her car and called 9-1-1 to try to get a police supervisor to come to the house to allow her inside. In light of this evidence, primarily drawn from Regan’s own testimony, the District Court properly granted summary judgment on Regan’s false imprisonment claim against Johnson.
III.
A.
Under Monell v. Dep’t of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a city, municipality, or private entity that is a state actor “may not be held vicariously liable under § 1983 for the actions of its agents” because “[tjhere is no respondeat superior theory of municipal liability.” Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir.2006) (citing Monell, 436 U.S. at 691, 98 S.Ct. 2018). Thus, GEO can be liable for any constitutional deprivations suffered by Regan only if “there is a direct causal link between a ... policy or custom and the alleged constitutional deprivation.” City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A direct causal link can be shown in two ways. First, “a body [such as GEO] may ... be sued directly if it is alleged to have caused a constitutional tort through ‘a policy statement, ordinance, regulation, or decision of *923 ficially adopted and promulgated by that body’s officers.’ ” City of St. Louis v. Praprotnik, 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting Monell, 436 U.S. at 690, 98 S.Ct. 2018). Second, Regan could establish the requisite causal link between the constitutional deprivation and a custom, “even though such a custom has not received formal approval through the body’s official decisionmaking channels.” Monell, 436 U.S. at 691, 98 S.Ct. 2018. Such a custom exists “when, though not authorized by law, ‘such practices of state officials [are] so permanent and well settled’ that they operate as law.” Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir.2007) (quoting Monell, 436 U.S. at 690, 98 S.Ct. 2018).
Once a policy or custom is identified, a body “may be liable only if it acted with deliberate indifference to the consequences of a policy that caused plaintiffs’ harm.” Williams v. Borough of West Chester, 891 F.2d 458, 467 n. 14 (3d Cir.1989) (citing City of Canton v. Harris, 489 U.S. 378,109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Regarding deliberate indifference, “ ‘something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm’ to plaintiffs.” Black v. Ind. Area Sch. Dist., 985 F.2d 707, 712-13 (3d Cir.1993) (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1025 (3d Cir.1991)).
Regan contends that GEO’s policy of requiring the numbers on an inmate’s commitment and release forms to match before the inmate is released caused her constitutional harm, and that GEO was deliberately indifferent to the consequence of the policy — delayed release of inmates. The problem with Regan’s argument is that while GEO has frequently identified discrepancies in inmate papeiwork, the policy has not had the consequence of delaying inmate releases. GEO’s records supervisor testified that discrepancies in the numbers on inmate paperwork has been a problem for a long time, but that no process was in place to correct these errors other than to have prison personnel phone the court when errors would arise. Regan contends that this testimony shows that GEO was deliberately indifferent to the consequence of its policy.
However, Regan adduced no evidence that inmate releases were frequently delayed due to these discrepancies. In fact, the records supervisor testified that when prison personnel have called the court to clear up discrepancies, the district justices have been cooperative in doing so. Regan even acknowledges that these problems are “usually quickly resolved, as a simple call to the issuing court clears up the discrepancy.” Appellant’s Br. at 19. Additionally, Regan has adduced no evidence that a delay as long as the one in this case has ever happened before. In light of this, a reasonable jury could not find that GEO was deliberately indifferent to a consequence of its policy that, based on GEO’s experience, was unlikely to occur.
Regan argues also that GEO’s deliberate indifference is evidenced by the fact that discretion was not given to prison staff to use common sense in deciding whether to release an inmate, rather than adhering to the strict policy of not allowing a release if the numbers on commitment and release forms do not match. However, GEO’s expert opined that this policy is consistent with both the American Correctional Association’s national standard and with “sound correctional practices,” and that “[i]t is far beyond the scope and responsibility of a prison records clerk to correct a court release document without court approval.” App. at 478-80. Taking such action “could lead to disciplinary action or possible dismissal of the prison employee.” Id. at 480. Therefore, GEO was not deliberately indif *924 ferent by not giving its staff discretion to decide when to release an inmate.
The delay in Regan’s release was due to the unfortunate timing of the Christmas holiday, not any deliberate indifference on the part of GEO. The District Court’s grant of summary judgment on Regan’s § 1983 claim was proper.
B.
“In any case sounding in negligence, a plaintiff must demonstrate: (1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff.” Farabaugh v. Pa. Tpk. Comm’n, 590 Pa. 46, 911 A.2d 1264, 1272-73 (2006) (citing R.W. v. Manzek, 585 Pa. 335, 888 A.2d 740, 746 (2005)). The District Court noted that it was “aware of no authority in the Third Circuit or under Pennsylvania law that establishes the contours of the duty of care that a Pennsylvania jailer must exercise to effect a prisoner’s release,” and so it cited Whirl v. Kern, 407 F.2d 781, 792 (5th Cir.1968), for the proposition that “jailers have a duty to effect a prisoner’s release within a reasonable amount of time.” Regan v. Upper Darby Twp., No. 06-1686, 2009 WL 650384, *9, 2009 U.S. Dist. LEXIS 19807, *30-31 (E.D.Pa. Mar. 11, 2009). Given that courts in this Circuit have applied a similar standard to other torts in this context, and given that Regan does not raise an issue with this standard, we will apply it as well. See Burgess v. Roth, 387 F.Supp. 1155, 1161 (E.D.Pa.1975) (holding that an unreasonable delay in a prisoner’s release can result in the tort of false imprisonment).
Regan contends that given that the Christmas holiday was pending, her confinement for multiple days was a foreseeable consequence of failing to process the release in a more timely fashion, and therefore GEO was negligent in not doing so. Regan argues also that the release paperwork was delivered to the prison by her brother and was reported lost at one point, and therefore it remains an issue of fact whether GEO negligently lost the release papers. However, GEO’s records supervisor testified that in a typical situation where the paperwork contains no discrepancies, it takes an average of four to six hours from the time the prison receives the release paperwork to when the inmate is released. Thus, given that Michael Re-gan did not arrive at the prison until noon on December 23, 2004, Regan cannot establish that the amount of time it took to release her was unreasonable, even if the paperwork were lost for a time. This is especially true given that there was indeed a discrepancy in Regan’s paperwork, and that discrepancy was due to an error on the part of the Upper Darby District Court’s clerk, not anyone employed by GEO. Additionally, Regan makes no allegation that GEO failed to make an inquiry with the Upper Darby District Court to resolve the discrepancy in the paperwork. The evidence simply shows that once the discrepancy was discovered, the Upper Darby District Court had closed for the holiday, and even Regan’s brother was unable to contact anyone there. The delay in Regan’s release was the unfortunate consequence of the Christmas holiday and the closing of the Upper Darby District Court, not of negligence on the part of GEO.
Finally, Regan asserts that GEO was negligent generally for “maintaining a policy of release known to be flawed.” Appellant’s Br. at 24. However, as explained above with reference to Regan’s § 1983 claim, the release policy was consistent with national standards and sound correctional practice, and there was no evidence that the policy regularly caused significant delays in inmate releases. Thus, the poli *925 cy was not “known to be flawed,” and GEO was not negligent in adhering to it.
C.
Regan makes cursory mention of her state law false imprisonment claim against GEO in her brief and presents no substantive argument regarding it. “[Casual mention of an issue in a brief is cursoiy treatment insufficient to preserve the issue on appeal.” Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir.1993) (citing Simmons v. City of Philadelphia, 947 F.2d 1042, 1066 (3d Cir.1991)). Thus, this issue has been waived.
Notwithstanding the waiver, while an unreasonable delay in a prisoner’s release can result in the tort of false imprisonment, Burgess, 387 F.Supp. at 1161, as explained above regarding Regan’s negligence claim and given the circumstances of this ease, the delay in Regan’s release was not unreasonable. There was a legitimate problem with Regan’s paperwork, and the prison had only a few hours in which to deal with the problem before the Christmas holiday. While Regan’s being confined in jail over Christmas was certainly unfortunate, it was not the result of false imprisonment.
IV.
For the foregoing reasons, we will AFFIRM the judgment of the District Court.

. Regan also included a malicious prosecution claim as part of Count One of her first amended complaint filed in the District Court on November 13, 2006. However, Count One was dismissed by the District Court with prejudice as to Johnson by stipulation of the parties on November 26, 2008. Thus, we need not address Regan's arguments in this appeal regarding malicious prosecution as to Johnson.